[Crim. No. 1018.    In Bank.—November 30, 1903.]

## Ex Parte F. W. BRAUN, on Habeas Corpus.

MUNICIPAL CHARTER—TAXATION FOR REVENUE—"MUNICIPAL AFFAIR"—CONSTITUTIONAL LAW—POWER OF LEGISLATURE.—A municipal charter framed under section 8 of article XI of the constitution, conferring upon it the power of taxation for purposes of revenue, makes such power a "municipal affair," within the meaning of section 6 of that article, making an exception of "municipal affairs" to the operation of general laws; and such power cannot be withdrawn or abrogated by the legislature. [Beatty, C. J., and Lorigan, J., dissenting.]

ID.—OPERATION OF POLITICAL CODE—TAXATION FOR REGULATION ONLY.—Section 3366 of the Political Code, enacted in 1901, providing that "boards of supervisors of the counties of the state, and the legislative bodies of the incorporated cities and towns therein, shall, in the exercise of their police powers, and for the purpose of regulation, as herein provided, and not otherwise, have power to license all and every kind of business not prohibited by law," etc., is not applicable to a city governed by a charter framed under the constitution, where such charter confers upon its legislative body the power to impose and collect license-taxes for revenue purposes. [Beatty, C. J., and Lorigan, J., dissenting.]

ID.—SOURCE OF CHARTER POWER OF TAXATION.—The power of cities under freehold charters to raise money by taxation for municipal purposes does not find its source in any grant by the legislature, but has been directly granted by the people of the state by the provisions of the constitution.

HABEAS CORPUS to test the validity of an ordinance of the City of Los Angeles, under which petitioner was convicted in the Police Court. H. C. Austin, Police Judge. Charles Elton, Chief of Police, Respondent.

The facts are stated in the opinion of the court.

Lawler, Allen & Van Dyke, for Petitioner.

Cristopher C. Wright, Huey & Beach, Frank G. Henderson, and George S. Hupp, *Amici Curiæ.*

W. S. Mathews, City Attorney, for Respondent.

ANGELLOTTI, J.—Petitioner was taken into custody under a warrant issued upon a complaint filed in the police court of the city of Los Angeles, charging that he, on the seventh day of April, A. D. 1903, in said city, "did willfully and unlawfully conduct, manage, and carry on the business of a wholesale liquor dealer without first having procured a license from the city of Los Angeles so to do, . . . contrary to the forms of the ordinances and resolutions adopted and approved by the municipal authorities of said city." Having been brought before said police court under said warrant, he was committed to the custody of the chief of police of said city pending further proceedings in the case, and being now detained by said chief of police under said warrant and commitment, seeks his discharge on *habeas corpus.*

The ordinance of the city of Los Angeles upon which the prosecution is based is entitled: "An ordinance providing for licensing and regulating the carrying on of certain professions, trades, callings, and occupations carried on within the limits of the city of Los Angeles," and was enacted February 28, 1903. It is devoid of regulating provisions, being devoted entirely to the imposition of a license-tax upon various trades and occupations and the collection thereof. It imposes a license-tax upon a great majority of callings and occupations, and in several instances the amount of tax is based upon the amount of business transacted. It includes numerous callings which are in no degree subject to regulation. By its terms, a license-tax of sixty dollars per month is imposed on every person, firm, or corporation conducting, managing, or carrying on the business of a wholesale liquor dealer, and a wholesale liquor establishment is defined by the ordinance to be any place where spirituous, vinous, malt, or mixed intoxicating liquors are sold, served, or given away in quan-

tities of not less than one fifth of a gallon, and not to be drunk upon the premises.

Taking into consideration the absence of regulatory provisions, the amounts of the several taxes imposed, and the nature of many of the subjects of taxation named in the ordinance, including the particular business here involved, it is very clear that the license-tax upon the business alleged to be conducted by petitioner was imposed solely for the purpose of raising revenue. (See *Town of Santa Monica* v. *Guidinger,* 137 Cal. 658.) This does not appear to be questioned by the respondent.

It is also clear, under the decisions of this court, that the freeholders' charter of the city, which was approved by the legislature in 1889, must be construed as conferring upon the municipality the authority to license all occupations and callings carried on within the city, for the purpose of revenue, as well as regulation. (Charter, sec. 2, subd. 13; Stats. 1889, p. 456.) The case, in this respect, is not distinguishable to petitioner's advantage from that of *Ex parte Frank,* 52 Cal. 606,[1] and that of *City of San Jose* v. *San Jose etc. R. R. Co.,* 53 Cal. 475 (480), wherein substantially similar charter provisions were construed. Subdivision 13 of section 2 of the Los Angeles charter, taken as a whole, clearly contemplates the collection of revenue licenses. It must also be remembered that at the time of the adoption of said charter, municipal corporations and counties were allowed to license for revenue. The ordinance in question was enacted by the mayor and council of Los Angeles in the exercise of the power to license for revenue, conferred by the city charter, and we see no reason to question its validity, if the power of the municipality to license for revenue purposes has not been taken away by the legislature of the state. The state legislature in 1901 added a new section to the Political Code, providing that "Boards of supervisors of the counties of the state, and the legislative bodies of the incorporated cities and towns therein, shall, *in the exercise of their police powers, and for the purpose of regulation,* as herein provided, *and not otherwise,* have power to license all and every kind of business not prohibited by law," etc. (Pol. Code, sec. 3366.)

---

[1] 28 Am. Rep. 642.

The act adding this section to the Political Code has been held to be constitutional, and in a case wherein this court held that the section abrogated the power of county boards of supervisors to issue licenses for revenue purposes, speaking through Mr. Justice Garoutte, it said: "Every feature òf this act of 1901 indicates a plain purpose upon the part of the legislature to restrict the licensing power of boards of supervisors and city councils to matters of regulation alone." (*Ex parte Pfirrmann*, 134 Cal. 143, 148.)   That the power of municipalities incorporated under the General Municipal Corporation Act to impose a license-tax for revenue was abrogated by such section 3366 was held in *City of Sonora* v. *Curtin*, 137 Cal. 583, and *Town of Santa Monica* v. *Guidinger*, 137 Cal. 658.   Section 3366 of the Political Code, enacted in 1901, is unquestionably a general law, and operative so far as the legislature had the power to make it so, upon every county and municipality within the state.   It is contended by respondent that the state legislature could not deprive a municipality, existing under a freeholders' charter, of the power conferred by such charter to impose a license-tax for revenue purposes.   It is admitted that under the provisions of section 6 of article XI of the constitution, as amended in 1896, *all* cities and towns and charters thereof framed or adopted by authority of the constitution, are subject to and controlled by general laws, *"except in municipal affairs."* But it is contended that the collection of a license-tax for revenue is, under the provisions of the Los Angeles charter, a "municipal affair," and that, therefore, the charter provisions are paramount.   This contention presents the real question in the case.   Admittedly, the provisions of a charter framed under and in accordance with the provisions of section 8 of article XI of the constitution, and approved by the legislature as therein provided, are, by virtue of the amendment of 1896 to section 6 of article XI of the constitution, so far as "municipal affairs" are concerned, supreme and beyond the reach of legislative enactment.

It is contended at the outset by petitioner that this question was necessarily involved in the cases of *City of Sonora* v. *Curtin*, 137 Cal. 583, and *Town of Santa Monica* v. *Guidinger*, 137 Cal. 658, as section 6 of article XI of the constitu-

tion makes no distinction in this respect between cities and towns incorporated under the General Municipal Corporation Act and those operating under freeholders' charters. It is, however, manifest that there is a distinction between these two classes, and that the constitutional amendment of 1896 to such section in no wise affects cities and towns incorporated under the General Municipal Corporation Act. Such cities and towns were created under general laws, which general laws may at any time be altered, amended, or repealed by the legislature, and the amendment of 1896 has not in the slight-est degree impaired the power of the legislature in this respect. The only limitation on the power of the legislature in regard to such cities and towns is, that it must not enact "special laws" in regard thereto. They have always been and still are subject to and controlled by general laws in municipal affairs. This distinction was recognized in *Morton* v. *Broderick*, 118 Cal. 474, where the court, through Mr. Justice Henshaw, after stating the reason for the amendment as follows: "It had been believed by the legislature and by the people that it would be wiser to relieve *charters of cities* from the operation of general laws affecting municipal affairs, lest otherwise there would be danger of the charter provisions being entirely frittered away," said: "Under the constitutional amendment such acts" (speaking of an act held by the court to deal with municipal affairs), "*now* apply only to cities . . . which have organized under the general scheme embraced in the Municipal Corporation Act." The Sonora and Santa Monica cases did not, therefore, involve the question here presented.

The meaning of the term "municipal affairs," as these words are used in the constitutional amendment of 1896, has been considered in several decisions of this court. In discussing the effect of this amendment, this court has always recognized the reason that impelled its adoption. After much public discussion, and upon an exhaustive consideration of the question, it had been decided by this court that the legislature, prior to this amendment, had power, by general laws, to supersede, or take away, without the consent of the municipality, the powers conferred upon it by a special charter. (*Thomason* v. *Ashworth*, 73 Cal. 73; *People* v. *Henshaw*,

76 Cal. 436; *Davies* v. *Los Angeles,* 86 Cal. 37.)   These de-
cisions had demonstrated that the power given by the consti-
tution' to cities to frame charters for their own government
for the purpose, as was said in *People* v. *Hoge,* 55 Cal. 612,
618, of emancipating them from the authority and control
formerly exercised over them by the legislature in municipal
matters, were unavailing if such charters could at once be
superseded by any general legislative enactment.   Under
these circumstances, the section of the constitution providing
that all cities and towns and the charters thereof should be
subject to and controlled by general laws was amended by the
addition of the words "except in municipal affairs."   What-
ever conflict may be found in the opinions of this court as to
the precise meaning of the term, it has always been conceded
by all the justices that the object of the amendment was to
secure to the municipality that had, under the provisions of
the constitution, adopted a charter for its own government,
the maintenance of its charter provisions in municipal mat-
ters, and to deprive the legislature of the power, by laws
general in form, to interfere in the government and manage-
ment of the municipality.   It was enacted upon the principle,
as stated by Mr. Justice Garoutte in *Fragley* v. *Phelan,* 126
Cal. 383, 387, "that the municipality itself knew better what
it wanted and needed than did the state at large, and to give
that municipality the exclusive privilege and right to enact
direct legislation which would carry out and satisfy its wants
and needs."   The words used in the amendment are words
of wide import, broad enough to include all powers appro-
priate for a municipality to possess and actually conferred
upon it by the sovereign power.   The collection of a license-
tax for revenue purposes is a well-recognized exercise of the
taxing power.   (See *People* v. *Martin,* 60 Cal. 153.)   That
the power of taxation is a power appropriate for a munici-
pality to possess is too obvious to merit discussion.   As was
said by Mr. Justice Field in *United States* v. *New Orleans,*
98 U. S. 381, "A municipality without the power of taxation
would be a body without life, incapable of acting, and serving
no useful purpose."   It was further said in that case that:
"When such a corporation is created, the power of taxation
is vested in it, as an essential attribute, for all the purposes
CXLI. Cal.—14

of its existence, unless its exercise be in express terms pro-
hibited. For the accomplishment of these purposes, its author-
ities, however limited the corporation, must have power to
raise money and control its expenditure." When the power
to impose taxes is conferred upon a municipality to enable it
to raise the money essential for the purposes for which it is
created, that power necessarily becomes a municipal affair.
As was said of other powers and duties in *People* v. *William-
son*, 135 Cal. 415: "They are peculiarly for the inhabitants
of the city, and not directly for the benefit of any one else."
It is confined in operation to the city of Los Angeles, and
affects none but its citizens and taxpayers and those doing
business within its limits. Without it, the municipality can-
not exist, and the municipality alone is directly concerned in
its preservation. That taxation for *municipal purposes*,
whether by assessments upon property or a tax upon business,
is a purely municipal matter, is expressly recognized by sec-
tion 10 of article XI of the constitution, which prohibits the
legislature from imposing taxes upon municipal corporations,
or the inhabitants or property thereof, for *municipal pur-
poses*, and provides that the legislature may vest in the cor-
porate authorities thereof, *the power* to assess and collect
taxes for such purposes. It was said in *City and County of
San Francisco* v. *Liverpool, L. and G. Ins. Co.*, 74 Cal. 113,
124,[1] that the purpose of this section is to relegate to the local
boards the whole subject of county and municipal taxes for
local purposes, and that the legislature has no power to im-
pose any tax whatever within those territories for local
purposes. It was further said therein, speaking of a tax at-
tempted to be imposed on insurance companies by the legis-
lature for the benefit of fire departments of counties and
cities and counties, which was held to be clearly a municipal
purpose, that the fact that the state at large has an interest in
the efficiency of the departments does not render the end any
less a municipal one. The court said also: "The people of
the state have *such* an interest in all the police powers granted
to these municipalities. And, even if the state may exercise
a concurrent supervision over a subject, still, so far as actu-
ally controlled by the local board, it is a matter of municipal

[1] 5 Am. St. Rep. 425.

concern." (See, also, *People* v. *Martin,* 60 Cal. 153.) The case of *Alexander* v. *City of Elizabeth,* 56 N. J. L. 71, is in point upon this question of municipal affairs. The constitution of New Jersey provided that the legislature should not pass private, local, or special laws regulating the internal affairs of towns and counties. The legislature by special act attempted to provide for the licensing and regulating of race-courses by municipal authorities, and it was held that while, primarily, racing within the state was not a question which concerned the internal affairs of towns and counties, "a statute which confers powers upon the municipality to restrict, limit, or extend racing is a statute which does undoubtedly affect the internal affairs of such towns within the meaning of the constitution." The court further said: "It becomes a matter of the internal regulation of the affairs of the municipality by force of the statute, and it cannot be claimed, so far as the statute is concerned, to be a question any longer of state policy, but a matter concerning the internal affairs of the municipality to which it applies. It becomes the power of the municipality." It is of course true that the local power of taxation, like all other local powers, must have its origin in a grant by the state, and that it may at all times be controlled by the sovereign power. But it does not follow that the legislative department of the state may so control it. In the absence of constitutional provisions relating to the subject, the legislative department would necessarily have unlimited sway, and could, for the state, confer, modify, or withdraw the power and prescribe such regulations as it saw fit for its exercise. The state constitution is, however, the highest expression of the will of the people of the state, and so far as it speaks, represents the state. So, where, as here, a power is given in the constitutional method by special charter, and not by direct legislative enactment, it can be withdrawn only by amendment to the charter in the manner provided by the constitution. It is only when local power is not conferred by the state constitution, that legislative enactment is essential to its existence (Cooley on Taxation, 678), or is of adequate force to withdraw it.

The power of cities operating under freeholders' charters to raise money by taxation for municipal purposes does not

find its source in any grant by the legislature. There is no enactment of the legislature purporting to vest such authority in such cities. Such power has been directly granted by the people of the state by the provisions of the state constitution. It was held by this court in *Security Savings Bank etc. Co.* v. *Hinton,* 97 Cal. 214, where the question was directly involved, that the authority given by the constitution to certain cities to frame and adopt "a charter for its own government" which "shall become the organic law thereof" is comprehensive enough to authorize a provision such as that contained in the charter of the city of Los Angeles providing for taxation for municipal purposes. It is true that the particular provision of the charter there involved was that relating to taxation on real and personal property, but that is immaterial to the particular question under discussion. There was at the time of the adoption of the charter no general law of the state prohibiting the imposition of a license-tax for revenue, and the same constitutional authority that sanctioned the provision for a property tax authorized the provisions for the revenue license, a method of raising money for local purposes then obtaining generally in the counties and cities of the state. Those provisions when legally incorporated in the charter constituted a grant from the state of the power to impose a license-tax for revenue purposes. This power, being so granted by the state to the municipality for municipal purposes, became a "municipal affair" of the city of Los Angeles within the meaning of those words as used in the constitution, and the legislature was without authority to withdraw or modify such power. There is absolutely no basis for the argument of counsel for petitioner that the amendment does not cover cases where the legislature by general laws withdraws powers from or grants powers to a municipality. If the local governmental powers bestowed by the constitution through the charter may be taken away by the legislature, it will readily be seen that the amendment of 1896 has accomplished nothing. It has already been attempted to be shown that when a power is conferred upon a municipality for municipal purposes that power becomes a municipal affair. As was said by the supreme court of New Jersey in *Sutterly* v. *Camden Common Pleas,* 41 N. J. L. 495, "To repeal a

section of the city charter which confers some power of government, or one restraining or limiting the exercise of some other, may be as effectual an interference with and regulation of its internal affairs as a law setting up within the municipality some new adjunct to the local government, or one which introduces radical change in the instruments and methods of administration.''

We have carefully examined the decisions of this court upon this question of ''municipal affairs,'' and find nothing therein inconsistent with the views herein expressed. *Ex parte Pfirr-mann*, 134 Cal. 143, dealt solely with the rights of counties to collect such a tax, and what is said therein as to the right of the legislature to say in what manner the taxing power *granted by it* shall be exercised has reference only to counties and such cities and towns as derive their power from the legislature.

Our conclusions are, therefore, that the power to collect a license-tax for revenue purposes was actually conferred upon the city of Los Angeles for municipal purposes by the charter framed for its government, under the provisions of section 8 of article XI of the constitution, and that such power is a ''municipal affair'' within the meaning of those words as used in section 6 of article XI of the constitution, and cannot be withdrawn or abrogated by the legislature. Section 3366 of the Political Code is therefore inapplicable to that city.

It follows that the writ issued must be discharged and the petitioner remanded, and it is so ordered.

Shaw, J., and Henshaw, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment remanding the petitioner and discharging the writ, and in most that is said in the opinion of Mr. Justice Angellotti. I am reluctantly constrained to conclude that, by the amendment to the constitution in question, the people of the state, moved by a temporary impulse (not yet entirely abated) to carry the notion of what is called ''local self-government'' to extremes, have taken away from the state an important part of that peculiar attribute of sovereignty, the taxing power, and given it to all the municipalities, great and small, which are

now organized, or which may be hereafter organized, under freeholders' charters. It is difficult to realize that the people of the state, through their legislature, have no longer the power to say that a license-tax—a tax upon the right to do business, a tax upon capacity—is unjust, unequal, and oppressive, and should not be tolerated anywhere within the state; but we think that such is now the law.

1. Section 13 of article II of the charter of Los Angeles, construing all its language together, clearly, it seems to me, gives power to the city to license for revenue.

2. The section of the constitution in question uses the loose, indefinable, wild words "municipal affairs," and imposes upon the courts the almost impossible duty of saying what they mean. This court has not undertaken, and probably will not undertake, to give a general definition of the words, so as to bring all future cases within the two categories of what is and what is not a municipal affair. A few cases involving the question have arisen, and in each of such cases the court has merely determined, as it was compelled to determine, whether the thing there involved was or was not within the indeterminate constitutional words. And, no doubt, in the future each case involving the question will be decided on its own facts, without an attempt at generalization. Now, in the case at bar, the city having the power to impose license taxes for revenue, and the taxes having been levied for the support of a municipal government, and the ordinance applying only to the territory of the city and the inhabitants thereof, and no other person being affected thereby, I cannot see how to hold that the matter is not a municipal affair, and am driven to the conclusion that it would be an usurpation of power to so hold. Of course, whether or not the people of the state were wise· in thus yielding up so important a power is not a judicial question.

Van Dyke, J., being disqualified, did not participate.

BEATTY, C. J., dissenting.—I dissent. The decision of the court is rested, and necessarily depends, upon the construction given to the phrase "municipal affairs," which by the amendment of 1896 was added to section 6 of article XI of the con-

stitution. That construction is thus stated in the principal opinion: "When a power is conferred upon a municipality for municipal purposes, that power becomes a municipal affair." It is to be observed of this construction that until it can be shown that any power is ever conferred upon, or exercised by, a municipality for other than municipal purposes the definition of a municipal affair gains nothing in point of clarity or precision by the inclusion of the words "for municipal purposes." We have no concern with powers that cannot be exercised, and since the powers of a municipality, if exercised at all, must be exercised exclusively "for municipal purposes," these words do not qualify the rest of the definition. With or without them, it means the same thing,—viz., that a power once conferred upon a municipality becomes, *ipso facto,* a municipal affair within the meaning of this section of the constitution, and is for all future time exempt from any control by act of the legislature, no matter how general in its intended operation upon all persons in every part of the state.

The conclusion which results from this view is aptly stated in the concurring opinion of Justice McFarland, who is "reluctantly constrained to conclude that, by the amendment of the constitution in question, the people of the state, moved by temporary impulse (not yet entirely abated) to carry the notion of what is called 'local self-government' to extremes, have taken away from the state an important part of that popular attribute of sovereignty, the taxing power, and given it to all the municipalities, great and small, which are now organized, or which may be hereafter organized, under freeholders' charters. It is difficult to realize that the people of .the state, through their legislature, have no longer the power to say that a license-tax—a tax upon the right to do business, a tax upon capacity—is unjust, unequal, and oppressive, and should not be tolerated anywhere within the state; but we think that such is now the law." I should arrive at the same conclusion with the same reluctance if I felt constrained to adopt it. But I do not. The sole purpose of the amendment to section 6 of article XI of the constitution was to restore to the fundamental law what had been construed out of it by this court in a series of decisions .of which *Thomason* v. *Ashworth.* 73

Cal. 73, is the most conspicuous example. By that section the legislature had been prohibited from creating municipal corporations, as they had theretofore been created by special laws. In place of such special laws they were commanded to provide for the incorporation and organization of cities and towns by general laws. It was provided, further, that cities and towns theretofore organized (under special charters) might reorganize under such general laws whenever a majority of their electors so decided, and that all cities and towns theretofore organized (by special laws) or thereafter to be organized (under the general incorporation laws or through the action of a board of freeholders), and all charters thereof, should be controlled by and subject to general laws. From the most casual reading of the section it was plain that, unless the framers of the constitution intended to contradict themselves in the short space of a dozen lines, they did not mean to include among the general laws which would control the provisions of special charters the general laws for the incorporation and organization of municipal incorporations. It was accordingly held, in a maturely considered case decided shortly after the new constitution took effect, that the Consolidation Act, which constituted the charter of San Francisco, was not superseded or controlled by what was known as the McClure charter. (*Desmond* v. *Dunn*, 55 Cal. 242.) I am not aware that the soundness of that decision has ever been directly impeached, and certainly it is not to be questioned at the present day. Nevertheless, the court in *Thomason* v. *Ashworth*, 73 Cal. 73, by a bare majority, held that the charter of San Francisco, and every special charter granted by the state, was controlled by the Street Improvement Law, and this notwithstanding the dissenting opinion of Justice McKinstry,—concurred in by Justice Sharpstein, —in which it was demonstrated with irresistible logic that the Street Improvement Act, which had no operation or application outside of incorporated cities and towns, was nothing but a part of, or an amendment to, the general law for the incorporation of cities and towns, which it had been theretofore decided, in accordance with the plain intent of the constitution, would not control special charters. The result of this decision was to leave the legislature free to override

*ad libitum* the provisions of all special charters by the simple device of enacting statutes which were general in no other sense than that they applied generally to all municipal corporations, and which were not a part of the Municipal Incorporation Law only because they omitted to so style themselves in their titles.

This was the mischief, and the whole mischief, which the people intended to remedy when they inserted in the constitution the ambiguous and ill-chosen phrase "except in municipal affairs." Their desire was, as above stated, to put back into the constitution what had been construed out of it in *Thomason* v. *Ashworth*, 73 Cal. 73, and *People* v. *Henshaw*, 76 Cal. 436. The change was made for the behoof of the citizens of San Francisco and other specially chartered cities and towns in order to exempt them from interference in their local affairs by the enactment of laws binding upon them, but not binding upon the people of the state at large. They had no intention and no wish in extending this reasonable guaranty of self-government to the citizens of specially chartered cities and towns, to go to the extreme length of exempting them from the authority of the legislature in matters of general state policy susceptible of regulation by laws operating uniformly throughout the state upon all persons similarly situated, whether the inhabitants of incorporated cities or not. If this view be correct it indicates the correct construction of the words "municipal affairs." They stand in contradistinction to "state affairs," and whenever a matter is found susceptible of general regulation by a law which binds all the people of the state, and when it is so regulated, it ceases from that time to be, although before it may have been, a municipal affair.

It is thought to be a conclusive argument against this view that it involves the possible extinguishment of all municipal privileges; for it is said if the legislature by exempting what was formerly a subject of taxation by a general law can invalidate local ordinances imposing taxes on the subject so exempted, they could invalidate all local regulations touching matters universally conceded to be of peculiar municipal concern. The validity of this argument depends upon the assumption either that the legislature *can* regulate all such

matters by general laws uniformly operating throughout the state, or that, while that is impossible, they will pass laws which in terms purport to make such general regulations, although they are in fact impracticable or oppressive. The argument that because power may be abused therefore it cannot exist is one that has been repudiated by this and all other courts times without number, and it is not to be supposed that because the legislature may enact oppressive and unreasonable general laws it has no power so to legislate. It unquestionably has the power, and the only remedy for its abuse is the ballot-box. Ordinarily, this is a fairly effective remedy, and at all events it is no help to the construction of a doubtful clause of the constitution to say that if it is construed in a particular way the legislature may do something absurd and unheard of. The alternative assumption that all matters now regarded as peculiarly the subject of local regulation under the powers conferred by special charters may in course of time be found susceptible of reasonable and proper regulation by general laws operative on the same subjects throughout the state is opposed to all experience and all probability; but conceding that it might be so, the only result would be, that as such legislation was discovered to be possible with respect to one matter after another now deemed a municipal affair, we should simply find ourselves governed throughout the state by good general regulations, instead of good special regulations in particular localities. Such a prospect should have no terrors for any one imbued with the spirit of a constitution which above all other things insists upon general laws wherever they can be made applicable, and requires all laws of a general nature to have a uniform operation. It is this pervading spirit of the constitution which demands that acts of the legislature establishing and defining the general policy of the state with respect to such a matter as subjects of taxation, should be supreme over all local regulations, and that such a subject so regulated should pass from the category of "municipal affairs."

But whatever may be thought of these views it is at least certain that there must be some criterion other than the mere fact of its inclusion in a charter by which to determine whether a particular provision is a municipal affair. If the mere fact

that a provision is in a charter (necessarily for municipal purposes) stamps it as a municipal affair, there is nothing left for that clause of the constitution to operate upon which plainly declares that except in municipal affairs the provisions of all charters are controlled by general laws.

It is said in the principal opinion that a contention of counsel similar to that which I have endeavored to enforce would deprive the amendment of 1896 of any meaning or effect whatever. It seems to me to be giving the amendment a very potent and beneficial effect to hold that it prevents the legislature from impairing the provisions of special charters by laws like the Vrooman Act, which apply only to municipal corporations, and which are in substance mere amendments to the Municipal Corporation Act. This was the effect which Justice McKinstry strove to give to the original section, and this is the effect which the court refused to give it. To reverse that ruling, and restore the constitution to what it was intended to be, is something achieved, so that to give the amendment some effect it is not necessary to go to the extreme of holding that it has rendered local charters supreme over laws that are general in the broadest sense of the word. The legislature has, in effect, declared that no man in the state, in city or county, shall be taxed upon his occupation. If this is a just principle of taxation,—and of that the legislature is the final judge,—it holds good in cities as in counties, each of which requires local revenues for local purposes, and since the law is equally applicable to all the people, and was designed for all, it should bind all alike.

Lorigan, J., concurred in the dissenting opinion.

Rehearing denied.