[No. B068533. Second Dist., Div. One. Feb. 26, 1993.]

RAYMOND FIELDER et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Respondent.

## COUNSEL

Ronald A. Zumbrun, Anthony T. Caso and Alan W. Foutz for Plaintiffs and Appellants.

Lillick & Charles and Lawrence N. Minch as Amici Curiae on behalf of Plaintiff and Appellants.

James K. Hahn, City Attorney, Richard A. Dawson, Assistant City Attorney, and Michael L. Klekner, Deputy City Attorney, for Defendant and Respondent.

## OPINION

### SPENCER, P. J.—

#### INTRODUCTION

Plaintiffs Raymond Fielder and others appeal from a summary judgment entered in favor of defendant City of Los Angeles.

#### FACTUAL BACKGROUND

On May 31, 1991, defendant's city council enacted ordinance No. 166976. The ordinance imposes upon each deed or instrument in writing that transfers or conveys real property to a purchaser a tax of $2.25 for each $500 or fractional part thereof of the value of the property, as determined from the purchase price. The individual plaintiffs were assessed and required to pay this tax upon selling their residences.[1] In initiating the instant action, plaintiffs sought a declaration that the transfer tax imposed pursuant to ordinance No. 166976 violates article XIII A, section 4, of the California Constitution and is preempted by Government Code section 53725, subdivision (a).

#### CONTENTIONS

##### I

Plaintiffs contend ordinance No. 166976 violates article XIII A, section 4, of the California Constitution.

##### II

Plaintiffs further contend ordinance No. 166976 is preempted by Government Code section 53725, subdivision (a).

#### DISCUSSION

##### I

■ Plaintiffs contend ordinance No. 166976 violates article XIII A, section 4, of the California Constitution. The contention lacks merit.

Article XIII A was added to the state Constitution by an initiative measure known as Proposition 13 on June 6, 1978. While plaintiffs argue the

---

[1] Plaintiff Howard Jarvis Taxpayers Association represents various individual taxpayers who would be subject to the transfer tax upon selling their real property. The other institutional plaintiffs assert an interest in the action by virtue of the perceived negative impact upon their livelihoods from the added cost of buying and selling real property.

applicability only of section 4 to this case, article XIII A is best analyzed as a whole.

Section 1 of article XIII A establishes a ceiling on the amount of any ad valorem tax on real property of 1 percent of the cash value of the property, subject to specific exceptions. The ceiling may be exceeded to pay the interest and redemption charges either on preexisting voter-approved indebtedness or on future voter-approved indebtedness incurred for the acquisition or improvement of real property. In the latter case, the bonded indebtedness must be approved by a two-thirds majority of the votes cast.

Recognizing that there had been several years of runaway inflation in the value of California real property and a concomitant inflation in the value at which such property was assessed for tax purposes, section 2 of article XIII A contains a "value roll-back" provision. Full cash value is defined as the assessed valuation shown on the 1975-1976 tax bill except when property is purchased, newly constructed or changes hands after that assessment. Essential reconstruction (that occasioned by a disaster or necessary for compliance with seismic safety ordinances) is excluded from the definition of "newly constructed" property. The full cash value base of the property may be increased no more than 2 percent per year to reflect the rate of inflation.

Section 3 of article XIII A limits the ability of the state Legislature to enact increased state taxes. It provides: "From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed." Section 3 limits the taxing authority of the state Legislature and expresses "an absolute ban on new ad valorem taxes on real property"; in this respect, it is a mere restatement of section 1. (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 253 [279 Cal.Rptr. 325, 806 P.2d 1360].)

Section 4 imposes limits on the ability of local governmental entities to enact new taxes. It provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

In *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], the California Supreme Court first construed

the meaning of section 4 and, specifically, of the phrase "special taxes." Noting the fundamentally undemocratic nature of a supermajority requirement (32 Cal.3d at p. 52), the court rejected the taxpayer's argument that "special taxes" means all additional or supplemental taxes other than those specifically excepted. ■ Constitutional provisions must be construed together, avoiding surplusage and giving significance to every part. (*Id.* at p. 54.) The drafters of article XIII A had demonstrated in section 3 that they knew how to say "any taxes" when they meant it; they did not use comparable language in section 4. (*Farrell, supra,* at p. 56.) Accordingly, the court holds, the phrase "special taxes" means taxes levied for a specific purpose rather than a general fund levy. (*Id.* at p. 57; accord, *Heckendorn* v. *City of San Marino* (1986) 42 Cal.3d 481, 489 [229 Cal.Rptr. 324, 723 P.2d 64].)

Recognizing the essential meaning of *Farrell, Cohn* v. *City of Oakland* (1990) 223 Cal.App.3d 261 [272 Cal.Rptr. 714] interprets the excepting clause, at issue here, as prohibiting the imposition of ad valorem real property taxes and real property sale or transfer taxes which are special taxes. (At p. 263; see also *Heckendorn* v. *City of San Marino, supra,* 42 Cal.3d at p. 486.) ■ Plaintiffs argue *Cohn* is wrongly decided.

■ It is a settled principle of statutory construction that the subject of an exception ordinarily is the same as that to which the exception applies. (*Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 205 [182 Cal.Rptr. 324, 643 P.2d 941].) ■ In section 4 of article XIII A, the clause reading "except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property" is separated from the preceding clause by a comma. The subject of the preceding clause clearly is "special taxes," not *any* taxes. Any commonsense reading of the excepting clause thus leads ineluctably to the conclusion that the subject of that clause also is "special taxes," not "any" taxes. To give the excepting clause the meaning for which plaintiffs argue, this court would have to rewrite it entirely. We may not do that. ■ " 'Where the electorate has demonstrated the ability to make [its] intent clear, it is not the province of [an appellate] court to imply an intent left unexpressed.' [Citation.]" (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d at p. 252.) ■ Accordingly, we adopt the holding of *Cohn* v. *City of Oakland, supra,* 223 Cal.App.3d at page 263, that the enactment of or increase in a transfer tax is not prohibited by article XIII A when the transfer tax is a general, rather than a specific, tax.

## II

■ Plaintiffs further contend ordinance No. 166976 is preempted by Government Code section 53725, subdivision (a). We disagree.

Government Code section 53725 was enacted on November 4, 1986, as part of the initiative measure known as Proposition 62, which sought to place all taxing power in the hands of the voters.[2] Subdivision (a) of section 53725 provides: "Except as permitted in Section 1 of Article XIII A of the California Constitution, no local government . . . may impose any ad valorem taxes on real property. No local government . . . may impose any transaction tax or sales tax on the sale of real property within the city, county or district."

Since charter cities such as defendant have sovereign power over municipal affairs (Cal. Const., art. XI, § 5), subdivision (a) of Government Code section 53725 does not necessarily restrict the power of a charter city to impose a transaction tax such as that enacted by ordinance No. 166976. **(6a)** The Legislature may preempt such conflicting charter city legislation only where the matter addressed is one of such statewide concern as to warrant the Legislature's action. (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 7 [283 Cal.Rptr. 569, 812 P.2d 916].) "In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a 'municipal affair' to the extent of the conflict and must yield." (*Ibid.*)

■ The determination of whether an activity is a municipal affair or one of statewide concern "is an ad hoc inquiry; . . . 'the constitutional concept of municipal affairs is not a fixed or static quantity.'" Rather, it poses a question which "'must be answered in light of the facts and circumstances surrounding each case.'" (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 16.) Initially, "a court asked to resolve a putative conflict between a state statute and a charter city measure . . . must satisfy itself that the case presents an actual conflict between the two." (*Ibid.*) ■ That element is present here; there is a clear, unmistakable conflict between subdivision (a) of Government Code section 53725 and ordinance No. 166976. Hence, "the question of statewide concern is [a] bedrock inquiry through which the conflict between state and local interests is adjusted." (54 Cal.3d at p. 17.) ■ If the subject is not one of statewide concern, the charter city measure lies "'beyond the reach of legislative enactment.'" (*Ibid.*)

In other words, "[t]he phrase 'statewide concern' is . . . nothing more than a conceptual formula employed in aid of the judicial mediation of jurisdictional disputes between charter cities and the Legislature, one that

[2]These portions of Proposition 62 have been declared unconstitutional. (See *City of Woodlake* v. *Logan* (1991) 230 Cal.App.3d 1058 [282 Cal.Rptr. 27] and *City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623 [251 Cal.Rptr. 511].)

facially discloses a focus on extramunicipal concerns as the starting point for analysis. By requiring, as a condition of state legislative supremacy, a dimension demonstrably transcending identifiable municipal interests, the phrase resists the invasion of areas which are of intramural concern only, preserving core values of charter city government." (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 17.) It is important that courts "avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern. . . . When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (*Id.* at pp. 17-18.) Thus, "the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative suppression based on sensible, pragmatic considerations." (*Id.* at p. 18.)

In *California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra,* 54 Cal.3d 1, the following factors were considered decisive: There was a long-standing history of legislative efforts to achieve a tax rate parity between federal and state commercial banks and other financial institutions, which had culminated in an addition to the state Constitution and subsequent enabling legislation, including the provision at issue which imposed a state tax in lieu of all others. (*Id.* at pp. 18-20.) There was an "emerging parity of function between savings banks and commercial banks in the market place," and the savings and loan industry was in an "increasingly vulnerable financial condition." (*Id.* at p. 22.) These factors made the regulatory aspects of taxation a subject of statewide concern. (*Id.* at p. 23.) The incursion made on the municipal taxing authority was limited, affecting only a small number of the corporations subject to the city's tax. Thus, the loss of revenue left the city's taxing authority "fundamentally intact." (*Id.* at pp. 24-25.)

In the instant matter, it fairly may be said that easing the burden of property taxation has been a matter of legislative concern for at least two decades. Beginning in 1968, the Legislature enacted a long series of tax relief measures, ranging from exemptions, credits and refunds to postponements. (Rep. of the Senate Com. on Property Tax Equity and Revenue to the Cal. State Sen. (June 1991) pp. 23-24.) Recognizing that roughly half of the average property tax revenue growth of 11.5 percent per year from 1968 to 1972 was attributable to increasing tax rates, the Legislature capped tax rates in 1972. (*Id.* at p. 23.) However, the runaway inflation of real property values during the early 1970's meant that "[t]ax levies continued to grow

unabated"; from 1974 to 1978, assessed values increased at an average rate of 12.5 percent per year. (*Ibid.*) This imposed an increasing burden on those property owners who were, essentially, sitting on paper assets in that they had no intention of selling. It was in this setting that article XIII A was added to the California Constitution.

Plaintiffs argue that eliminating the ability of local governments to impose transfer or sales taxes on real property is an essential part of effective property tax relief, as embodied by the inclusion of section 4 in article XIII A, citing *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281]. In the context of determining whether Proposition 13 violated the single-subject rule applicable to an initiative measure, the court in *Amador Valley* held that sections 3 and 4 of article XIII A "are reasonably germane, and functionally related, to the general subject of property tax relief." (22 Cal.3d at p. 231.) The statement has no other significance. (*City and County of San Francisco* v. *Farrell, supra*, 32 Cal.3d at p. 56.) Neither the inclusion in article XIII A of certain exceptions to the ability of various governmental entities to impose transfer taxes nor the enactment of Government Code section 53725, subdivision (a), establishes that the subject addressed is one of statewide concern. "[T]he Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern." (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].)

A transfer tax attaches to the privilege of exercising one of the incidents of property ownership, its conveyance. Such a tax is an excise tax rather than a property tax. (*Brunton* v. *Superior Court* (1942) 20 Cal.2d 202, 207 [124 P.2d 831]; *City of Huntington Beach* v. *Superior Court* (1978) 78 Cal.App.3d 333, 340-341 [144 Cal.Rptr. 236].) The tax cannot have the effect of imposing an increasing burden on property ownership, as do escalating ad valorem property tax rates and inflationary increases in assessed valuation. It is a one-time burden only, imposed solely on the privilege of disposing of one's property and realizing its actual (as opposed to "paper") value. Additionally, the imposition of a citywide transfer tax does not upset the delicate balance of a vulnerable group of citizens in the manner that local variations in the ad valorem property tax rate or assessment practices would. Thus, it has no impact on the remediation of the recognized evils which undergird the state's interest in controlling ad valorem real property taxation. Moreover, unlike *California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra*, 54 Cal.3d 1, there is no indication here that the state long had sought tax rate parity through the imposition of a single, unitary property-related tax, as opposed to a ceiling on real property taxation.

The transfer tax is purely local in its effects. It is " 'confined in operation to the City of Los Angeles, and affect[s] none but its citizens and taxpayers and those doing business within its limits.' [Citation.]" (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra*, 54 Cal.3d at p. 12.) ▇ The courts must be mindful that " 'the sweep of the state's protective measures may be no broader than its interest.' " (*Id.* at p. 25.) ▇ Government Code section 53725, subdivision (a), makes a substantial incursion on defendant's taxing authority. It affects all taxpayers subject to the transfer tax and eliminates a significant part of the annual budget revenues. Thus, the loss of revenue does not leave defendant's taxing authority substantially intact. This substantial interference in defendant's ability to levy an excise tax far exceeds the state's interest in regulating ad valorem property taxes. (Cf. *California Fed. Savings & Loan Assn., supra*, at pp. 24-25.) Inasmuch as the subject of property transfer taxes is not one of statewide concern, it is a municipal affair which lies " 'beyond the reach of legislative enactment' " in the case of charter cities. (*Id.* at p. 17.)

The judgment is affirmed.

Ortega, J., and Aranda, J.,* concurred.

Appellants' petition for review by Supreme Court was denied May 27, 1993.

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.