[No. A059535. First Dist., Div. One. Nov. 18, 1993.]

R. FREDERIC FISHER et al., Plaintiffs and Appellants, v..
COUNTY OF ALAMEDA et al., Defendants and Respondents.

COUNSEL

Lillick & Charles and Lawrence N. Minch for Plaintiffs and Appellants.

Manuela Albuquerque, City Attorney, Thomas B. Brown, Deputy City Attorney, Kelvin H. Booty, Jr., County Counsel, and Gladys M. Houston, Deputy County Counsel, for Defendants and Respondents.

James K. Hahn, City Attorney (Los Angeles), Richard A. Dawson, Assistant City Attorney, and Michael L. Klekner, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Respondents.

OPINION

NEWSOM, Acting P. J.—In this appeal, we consider a challenge to a municipal real estate transfer tax. R. Frederic Fisher and Susan K. Fisher (hereafter Fishers), brought a suit for declaratory relief and tax refund against the City of Berkeley and the County of Alameda (hereafter respondents), alleging that the city's real estate transfer tax violated section 4 of Proposition 13 (now art. XIII A, § 4, of the Cal. Const.) and a related provision of Proposition 62 (Gov. Code, § 53725). Respondents joined in a demurrer to the complaint which the trial court sustained without leave to amend. The Fishers filed a timely notice of appeal.

The City of Berkeley is a charter city enjoying home rule over municipal affairs under article XI of the California Constitution. On June 30, 1978, shortly before the effective date of Proposition 13, the Berkeley City Council adopted an ordinance, later codified in Berkeley Municipal Code section 7.52.040 et seq., which imposed a tax of one percent on the value of the consideration for real estate transfers. The ordinance exempted properties that were occupied by the owner for five years prior to the transaction. In August 1991, the city council amended the ordinance to increase the transfer tax to one and one-half percent and to eliminate the exemption for owner-occupied properties. About two months later, the Fishers sold a house in which they had lived for more than five years for a consideration of $1,025,000. After paying a transfer tax of $15,375, they applied to the city for a refund. They filed the present suit on June 24, 1992, following the city's denial of their claim.

The constitutional initiative, Proposition 13, was adopted by the voters on June 6, 1978, with the objective of providing real property tax relief. Section 4 of the proposition, which now appears as article XIII A, section 4, of the

California Constitution, provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." The inartful and ambiguous language of this provision was narrowly construed in a subsequent California Supreme Court decision, *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], which held that the term "special taxes" referred only to taxes levied for a specific purpose.

Four years after the *Farrell* decision, the statutory initiative, Proposition 62, imposed a general requirement of voter approval of local taxes. The Proposition also contained a prohibition of local real estate transfer taxes, although this provision was not mentioned in ballot materials. The initiative now appears in Government Code sections 53720 through 53730.[1]

■ On the issue of interpretation of article XIII A, section 4, of the California Constitution, the present appeal was anticipated by *Fielder* v. *City of Los Angeles* (1993) 14 Cal.App.4th 137 [17 Cal.Rptr.2d 630] (*Fielder*). The plaintiffs there similarly challenged a real estate transfer tax on the ground that it violated this constitutional provision. The *Fielder* court followed *Cohn* v. *City of Oakland* (1990) 223 Cal.App.3d 261 [272 Cal.Rptr. 714], which interpreted the excepting clause as prohibiting only those real estate transfer taxes which are special taxes within the meaning of *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47. The court reasoned, "It is a settled principle of statutory construction that the subject of an exception ordinarily is the same as that to which the exception applies. [Citation.] In section 4 of article XIII A, the clause reading 'except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property' is separated from the preceding clause by a comma. The subject of the preceding clause clearly is 'special taxes,' not *any* taxes. Any commonsense reading of the excepting clause thus leads ineluctably to the conclusion that the subject of that clause also is 'special taxes,' not 'any' taxes. . . . Accordingly, we adopt the holding of *Cohn* v. *City of Oakland, supra,* 223 Cal.App.3d at page 263, that the enactment of or increase in a transfer tax is not prohibited by article XIII A when the transfer tax is a general, rather than a specific, tax." (*Fielder, supra,* 14 Cal.App.4th at p. 142.)

■ With respect to Proposition 62, appellant relies on section 53725, which unambiguously prohibits local governments, including charter cities, from imposing a real property transfer tax: "[N]o local government or

---

[1]All further statutory references are to the Government Code unless otherwise indicated.

district may impose any transaction tax or sales tax on the sale of real property within the city, county or district." The term "local government" is defined in section 53720, subdivision (a), as follows: "(a) 'local government' means any county, city, city and county, including a chartered city or county . . . ."

The city maintains, however, that it was empowered to impose a real estate transfer tax taking precedence over conflicting provisions of state law by virtue of the home rule powers conferred on charter cities by California Constitution, article XI, section 5. The provision gives charter cities autonomy in "municipal affairs": "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to *municipal affairs*, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to *municipal affairs* shall supersede all laws inconsistent therewith." (Italics added.)

The law regarding the powers of taxation of charter cities is largely defined by two Supreme Court decisions—*Ex Parte Braun* (1903) 141 Cal. 204 [74 P. 780] (*Braun*) and *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916] (hereafter *CalFed*). Decided only a few years after passage of the home rule amendment, the *Braun* decision considered a city ordinance imposing a license tax on certain occupations solely for revenue purposes. A state statute then prohibited local license taxes except for regulatory purposes. Upholding the tax, the *Braun* court construed the constitutional grant of power to charter cities as being "broad enough to include all powers appropriate for a municipality to possess . . . ." (141 Cal. at p. 209.) Accordingly, " '. . . so far as "municipal affairs" are concerned,' charter cities are 'supreme and beyond the reach of legislative enactment.' " (*CalFed, supra*, 54 Cal.3d at p. 12, quoting *Braun, supra*, 141 Cal. at 207.) The court reasoned: "The collection of a license-tax for revenue purposes is a well-recognized exercise of the taxing power. [Citation.] That the power of taxation is a power appropriate for a municipality to possess is too obvious to merit discussion." (*Braun, supra*, 141 Cal. at 209.)

Following the *Braun* decision, a line of authority holds that ". . . the levy of taxes for city purposes is a municipal affair. . . ." (*City of Grass Valley* v. *Walkinshaw* (1949) 34 Cal.2d 595, 599 [212 P.2d 894]; *City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93 [308 P.2d 1]; *Century Plaza Hotel Co.* v. *City of Los Angeles* (1970) 7 Cal.App.3d 616, 626 [87 Cal.Rptr. 166].) The

*CalFed* decision did not question these precedents and found that *Braun* was soundly decided: "Our opinion rejected the state's attempt as a groundless invasion of a core area of municipal concern—the power to tax in support of local government—prohibited by the home rule provision." (*CalFed, supra,* 54 Cal.3d at pp. 12-13.) Nevertheless, the court saw a need for a more comprehensive analysis which allows for the possibility of statewide interest in local taxation.

The *CalFed* decision noted that, by granting charter cities sovereignty over municipal affairs, the constitution "implicitly recognizes state legislative supremacy over matters not within the ambit of that phrase." (54 Cal.3d at p. 13.) Exploring this area of state supremacy, the case law has developed "the counterpoint of 'statewide concern' as a conceptual limitation on the scope of 'municipal affairs' and thus on the supremacy of charter city measures over conflicting legislative enactments." (*Ibid.*) The *Braun* decision predated "the development of that branch of the doctrine" (*CalFed* at p. 14), and thus represents "an incomplete analysis." (*Id.* at p. 13.) "Although municipal taxation is a 'municipal affair' within the meaning of article XI, section 5(a), in that it is a necessary and appropriate power of municipal government, aspects of local taxation may under some circumstances acquire a 'supramunicipal' dimension, transforming an otherwise intramural affair into a matter of statewide concern warranting legislative attention." (*CalFed, supra,* 54 Cal.3d at p. 7.)

■ The court adopted a "decisional procedure intended to bring a measure of certainty to the process" of adjudicating home rule issues. (*CalFed, supra,* 54 Cal.3d at p. 16.) Initially, a court "must satisfy itself that the case presents an actual conflict between" a state statute and a charter city measure. (*Ibid.*) In cases presenting a true conflict, the court should then pursue "a focus on extramunicipal concerns as the starting point for analysis." (*Id.* at p. 17.)

"[T]he hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns . . . ." (54 Cal.3d at p. 18.) " 'If the subject of the statute fails to qualify as one of statewide concern, then the conflicting charter city measure is a "municipal affair" and "beyond the reach of legislative enactment." . . . If, however, the court is persuaded that the subject of the state statute is one of statewide concern and . . . the statute is reasonably related [and "narrowly tailored"] to its resolution, then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5[, subdivision] (a), from addressing the statewide dimension by its own tailored enactments.' " (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 399 [14

Cal.Rptr.2d 470, 841 P.2d 990], quoting from *CalFed*, *supra*, 54 Cal.3d at p. 17, fn. omitted.)

As respecting the issue on appeal, the *CalFed* court held that a local business license tax on a savings and loan association was barred by a state statute imposing an income tax on financial corporations in lieu of all other taxes and licenses. The court noted that tax equality among financial institutions has "been a theme of California corporate tax law for over 60 years" (54 Cal.3d at pp. 18-19), and, in light of adverse economic conditions, ". . . the aggregate tax burden on savings banks has assumed a new and more worrisome dimension. [¶] Centralized command over the intrastate tax burden on savings banks thus provides an additional and increasingly important regulatory lever. . . . And because the comprehensive regulation of savings banks takes place almost entirely at state and federal levels, these regulatory aspects of taxation necessarily transcend local interests; they become, in other words, a subject of statewide concern." (*Id.* at pp. 22-23.)

In applying the analysis of the *CalFed* decision to the case at bar, we are satisfied that the city's real property transfer tax in fact conflicts with Section 53725, subdivision (a). Though the city presents an elaborate argument based on legislative history, it cannot manufacture an ambiguity when none is apparent on the face of the language. (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 580 [7 Cal.Rptr.2d 245, 828 P.2d 147].) Having crossed this initial hurdle, we are directed by *CalFed* to inquire whether section 53725, subdivision (a), presents "a convincing basis for legislative action originating in extramunicipal concerns . . . ." (*CalFed*, *supra*, 54 Cal.3d at p. 18.) We turn first to its legislative context as part of Proposition 62.

A legislative initiative, Proposition 62 was sponsored by a group known as the California Tax Reduction Movement with the obvious purpose of overriding the Supreme Court decision in *City and County of San Francisco v. Farrell*, *supra*, 32 Cal.3d 47, 57) which narrowly construed section 4 of Proposition 13, now California Constitution, article XIII A, section 4. As we have seen, article XIII A, section 4, required a "two-thirds vote of the qualified electors" of a municipality to impose "special taxes . . . ." The *Farrell* decision construed the unfortunate phrase "special taxes" as referring only to taxes levied for a specific purpose. The California Tax Reduction Movement countered by sponsoring Proposition 62 which would amend the Government Code to require voter approval of "any general tax . . . ." (§§ 53723, 53724, and 53725, subd. (a).) The ballot arguments urged, " 'It will bring back rights the State Supreme Court took away from us, which we won with Proposition 13.' " (See *City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623, 633 [251 Cal.Rptr. 511].)

Shortly after its passage, the provisions of Proposition 62 requiring voter approval of local taxes were declared unconstitutional as violating California Constitution article II, section 9, subdivision (a). (*City of Westminster* v. *County of Orange, supra,* 204 Cal.App.3d 623; *City of Woodlake* v. *Logan* (1991) 230 Cal.App.3d 1058 [282 Cal.Rptr. 27].) This constitutional provision explicitly "exempts tax levies from the referendum power of the statewide electorate, as well as the municipal electorate in general law cities." (*City of Westminster* v. *County of Orange, supra,* 204 Cal.App.3d at p. 627.) "Thus, the major thrust of Proposition 62, at least as it was presented to the voters, was the fatally defective attempt to shift control of local taxation to the local electorate, the one portion of this statutory measure which clearly cannot survive constitutional scrutiny." (*Id.* at p. 633.)

The provision of Proposition 62 at issue here, that is, the prohibition of real estate transfer taxes in section 53725, appears in a provision with a purpose distinct from the voter approval requirements found in other parts of the initiative. In general, section 53725 merely incorporates by reference and reaffirms California Constitution, article XIII A, added by Proposition 13: "Except as permitted in Section 1 of Article XIII A of the California Constitution, no local government or district may impose any ad valorem taxes on real property. No local government or district may impose any transaction tax or sales tax on the sale of real property within the city, county or district. (b) Taxes permitted by Subdivision (b) of Section 1 of Article XIII A of the California Constitution shall not be subject to the vote requirements prescribed by this Article."

The provision may indeed reflect an assumption that Proposition 13 prohibited real estate transfer taxes; the second sentence in section 53725, subdivision (a), then would share the same purpose of reaffirming Proposition 13 as is expressed in the other provisions of the section. But Proposition 13 today must be read as construed in *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47. As we have seen, under this construction the general prohibition against real estate transfer taxes in subdivision (a) is an isolated statutory restriction on local government powers of taxation, not found in Proposition 13 and distinct from the voter approval requirements of other portions of Proposition 62.

This legislative analysis does not provide any ready answer to the inquiry mandated by the *CalFed* decision: what extramunicipal concern, if any, the disputed provision reflects. We may, however, reject two possible theories. First, it is clear that the intent of the sponsors of Proposition 62 to treat local real estate transfer taxes as a statewide concern does not in itself render the

matter a statewide concern. ■ "The assertion that a legislative body [or legislative initiative] may define what is, and is not, a matter of statewide concern was rejected in *Bishop* v. *City of San Jose* [(1969) 1 Cal.3d 56 (81 Cal.Rptr. 465, 460 P.2d 137)] itself: '[T]he fact, standing alone, that the Legislature has attempted to deal with a particular subject on a statewide basis is not determinative of the issue as between state and municipal affairs . . . ; stated otherwise, the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern.' " (*Johnson* v. *Bradley*, *supra*, 4 Cal.4th at p. 405.)

■ Secondly, we may not find an extramunicipal concern simply in the expression of a legislative desire to restrict local powers of taxation. Such a legislative objective would be directly at odds with the home rule of charter cities guaranteed by California Constitution, article XI, section 5; it would represent, in effect, a desire to nullify this constitutional guarantee to charter cities. If the prohibition on real estate transfer taxes represents nothing more than a legislative desire to deprive local governments of a particular, unpopular power of taxation, it will fall directly within the holding of *Braun*, *supra*, 141 Cal. 204; and, like the former state statute prohibiting business license taxes, it will not apply to charter cities. Article XI, section 5, gives charter cities the right to make their own decisions regarding desired forms of taxation.

■ Appellants argue, however, that the real estate transfer tax is linked to an extramunicipal concern associated with ad valorem property taxation. The immediate statutory context supports this connection; both in California Constitution, article XIII A, and section 53725, the prohibition on real estate transfer taxes is juxtaposed with restrictions on ad valorem property taxation. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].) The argument calls for careful examination of the statewide concerns found in the field of ad valorem property taxation.

In the decades of the 1960's and 1970's, California experienced high and rising real property taxes which prompted repeated legislative action to mitigate inequities. "Beginning in 1968, the Legislature enacted a long series of tax relief measures, ranging from exemptions, credits and refunds to postponements" (*Fielder*, *supra*, 14 Cal.App.4th at p. 144); in 1972, the Legislature put a cap on tax rates which had steadily risen in the preceding decade. The impact of these tax relief measures, however, tended to be offset by a boom in the residential real estate market. Home values were rising rapidly and at a much faster rate than those of commercial properties. (Leftco & Allison, *Prop. 13 Legal Aspects* (1979) 53 So.Cal.L.Rev. 173,

176-178.) "[T]he median price of an existing home doubled from $31,530 in 1973 to $62,430 in 1977. As a result, tax levies continued to rise because of sharply increasing assessment values. [Citation.] Some homeowners saw their tax bills double or triple during this period, well outpacing any growth in their income and ability to pay." (*Nordlinger* v. *Hahn* (1992) 505 U.S. __ [120 L.Ed.2d 1, 8, 112 S.Ct. 2326.) This runaway inflation in home values "imposed an increasing burden on those property owners who were, essentially, sitting on paper assets in that they had no intention of selling." (*Fielder*, *supra*, 14 Cal.App.4th at p. 145.)

In contrast to ad valorem taxation, a real estate transfer tax is imposed only upon the successful negotiation of a sale when it can be paid out of the sales price. Such a tax will lessen the profitability of a sale, but it does not involve the peculiar inequities that have been a matter of statewide concern in the field of ad valorem taxation. First, it does not involve the unfairness of taxing a "paper asset." As stated in *Fielder*, *supra*, 14 Cal.App.4th at page 145, "[t]he tax cannot have the effect of imposing an increasing burden on property ownership, as do escalating ad valorem property tax rates and inflationary increases in assessed valuation. It is a one-time burden only, imposed solely on the privilege of disposing of one's property and realizing its actual (as opposed to 'paper') value."

Secondly, the transfer tax does not impose an increasing annual burden which can outpace homeowners' ability to pay and thereby threaten the stability of home ownership and the livelihood of persons on fixed income or in economic difficulties. In the words of the *Fielder* decision, ". . . the imposition of a citywide transfer tax does not upset the delicate balance of a vulnerable group of citizens in the manner that local variations in the ad valorem property tax rate or assessment practices would. Thus, it has no impact on the remediation of the recognized evils which undergird the state's interest in controlling ad valorem real property taxation." (14 Cal.App.4th at p. 145.)

We recognize, of course, that the transfer tax may be unpopular among the same property owners who have opposed ad valorem property taxes. Nevertheless, it does not involve the recognized social evils that have been the object of legislation in the field of ad valorem property tax relief. In addition, it should be noted that the transfer tax has no impact outside the limits of the taxing municipality but rather "is purely local in its effects." (*Fielder*, *supra*, 14 Cal.App.4th at p. 146.) Like the business license tax in *Braun*, it affects "a core area of municipal concern—the power to tax in support of local government . . . ." (*CalFed*, *supra*, 54 Cal.3d at 13.) The burden of the tax rests only on the city's " 'citizens and taxpayers and those

doing business within its limits,' " (*id.* at p. 12) and the revenues from the tax serve only to support the city's finances. Under these circumstances, " '. . . the sweep of the state's protective measures may be no broader than its interest.' " (*Id.* at p. 25.)

Appellant relies on three decisions holding that statutes implementing constitutional provisions apply to charter cities. *City of Rancho Cucamonga* v. *Mackzum* (1991) 228 Cal.App.3d 929 [279 Cal.Rptr. 220] held that charter cities were subject to legislation enacted to implement Proposition 13. *John Tennant Memorial Homes, Inc.* v. *City of Pacific Grove* (1972) 27 Cal.App.3d 372 [103 Cal.Rptr. 215] struck down a local tax on payments by occupants of retirement homes on the ground that it violated a state statute implementing tax exemptions for charitable institutions. *Century Plaza Hotel Co.* v. *City of Los Angeles, supra,* 7 Cal.App.3d 616 invalidated a local tax on the purchase of alcoholic beverages on the ground that it conflicted with state regulation and taxation of alcoholic beverages.

These decisions assume relevance, however, only if one views Proposition 62 as implementing the local tax restrictions in section 4 of Proposition 13, now California Constitution article XIII A, section 4. Whatever may have been the intent of its sponsors, Proposition 62 has not in fact served to implement these constitutional restrictions on local taxes. The central focus of the legislative initiative, dealing with voter approval of local taxes, adopted an approach distinct from that of Proposition 13, section 4, and has been declared unconstitutional. The provision at issue here, section 53725, subdivision (a), adds a general prohibition on real estate transfer taxes which is not found in California Constitution, article XIII A, section 4, as we are obliged to construe it in light of *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47.

We do not reach other grounds for affirmance urged by respondents. We note only that the record does not present the issue of the retroactive or prospective application of section 53725; it is the 1991 amendment to the Berkeley ordinance, passed after the enactment of section 53725, that requires the Fishers, as five-year residents of the home, to pay a transfer tax. Despite the urging of amicus curiae, we decline to decide whether section 53725 is severable from other provisions of Proposition 62 which have been held unconstitutional. A ruling on this important constitutional question would be essentially gratuitous since it could provide no more than an alternative ground for affirmance of one of the two issues presented in the appeal.

The judgment is affirmed.

Stein, J., and Dossee, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 24, 1994. Lucas, C. J., and Baxter, J., were of the opinion that the petition should be granted.