Filed 3/29/22 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CIM URBAN REIT 211 MAIN STREET (SF) LP, et al., <br>     Plaintiffs and Appellants, <br> v. <br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br>     Defendants and Respondents. | A161244 <br><br> (City & County of San Francisco Super. Ct. No. CGC18569640) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

**THE COURT**:

The Court has considered the petition for rehearing filed by respondents City and County of San Francisco, et al., on March 17, 2022. Rehearing is denied.

It is ordered that the opinion certified for partial publication and filed herein on March 3, 2022, be modified as follows:

1. On page 3 of the opinion, in the first paragraph, delete the second sentence (which is in parentheses) and replace it with the following: "(See Govt. Code, § 53725, subd. (a).)"

2. On page 8 of the opinion, in the first full paragraph, delete the first sentence and replace it with the following: "At the heart of this case are transactions that featured a merger in March 2014 (Merger)."

1

3. On page 14 of the opinion, in footnote 3, delete the first sentence and replace it with the following: "In *731 Market Street Owner, LLC v. City and County of San Francisco* (2020) 50 Cal.App.5th 937 (*731 Market*), San Francisco contended that the Ordinance conflicted with the State Act (in that SFBTRC 1102 calculates the consideration for, or value of, the transferred property without excluding the value of a lien or encumbrance, while Section 11911 does exclude the value of any lien or encumbrance), and the Ordinance should therefore be evaluated under San Francisco's home rule powers rather than Section 11911."

The modification effects no change in the judgment.

Date: _____, P.J.

Filed 3/3/22 (unmodified opn.)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CIM URBAN REIT 211 MAIN STREET (SF) LP, et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO et al., <br><br>     Defendants and Respondents. | A161244 <br><br><br> (City & County of San Francisco Super. Ct. No. CGC18569640) |

Appellants CIM Urban REIT 211 Main Street (SF) L.P. and CIM Urban REIT Properties II, L.P., paid nearly $12 million in tax, penalties, and interest after respondents claimed that a 2014 merger triggered a transfer tax as to their San Francisco properties under San Francisco Business and Tax Regulations Code (SFBTRC), article 12-C, sections 1101 et seq. (Ordinance). Appellants thereafter filed a refund action, which the trial court dismissed after granting respondents' motions for judgment on the pleadings and summary judgment. From that dismissal, this appeal arises.

Appellants contend the court erred because, in appellants' view, the Ordinance conflicts with state law, respondents failed to comply with administrative procedures, and the Ordinance did not apply to the merger.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IID and IIE.

More specifically, appellants argue (1) the tax imposed under the Ordinance exceeds the authority of respondent City and County of San Francisco (San Francisco) under Revenue and Taxation Code section 11911, because it uses a higher tax rate and an expanded tax base; (2) San Francisco failed to comply with the Ordinance's notice and hearing requirements (SFBTRC 1115, 1115.1); (3) appellants were not liable for transfer tax under SFBTRC 1102, because they did not have any "realty sold" within the meaning of the Ordinance; (4) appellants were not liable for transfer tax under SFBTRC 1108, because they did not experience a partnership termination; and (5) San Francisco assessed the wrong entities.

We will affirm the judgment. In the published portion of our opinion, we conclude (1) San Francisco, as a charter city and a "city and county," is not bound by the limitations set forth in Revenue and Taxation Code section 11911; (2) the purported failure to comply with SFBTRC 1115 and 1115.1 does not entitle appellants to a refund of the tax they paid; and (3) in light of SFBTRC 1114 at the time of the merger, SFBTRC 1102 was triggered as to appellants' real property by the transfer of ownership interests in appellants' parent entity, consistent with Revenue and Taxation Code section 64, subdivision (c)(1); in the unpublished portion of our opinion, we conclude (4) SFBTRC 1108 applied due to the termination of appellants' parent, a partnership; and (5) appellants are not entitled to a refund based on their argument that San Francisco assessed the wrong entities.

I. <u>FACTS AND PROCEDURAL HISTORY</u>

For context, we begin with an overview of the relevant law. We then discuss the Ordinance, the merger, and the litigation in the trial court.

2

A. Legal Background

As a general rule, a city cannot impose taxes on the transfer of real property. (See Cal. Const., art. XIII A, § 3, subd. (a); art. XIII A, § 4; Govt. Code, § 53725, subd. (a).) There are, however, two means of imposing transfer taxes potentially available to local jurisdictions: (1) a state statute (Rev. & Tax. Code, § 11911) that authorizes any county or "city and county" to impose transfer taxes as set forth in that statute; and (2) a constitutional provision (Cal. Const., art. XI, § 5(a)) that authorizes a "charter city" to enact ordinances governing municipal affairs under the home rule doctrine. We look at both of these laws, since San Francisco is the only "city and county" in California (*Trans World Airlines, Inc. v. City & Cty. of S.F.* (9th Cir. 1955) 228 F.2d 473, 475; *Green v. Superior Court* (1889) 78 Cal. 556, 560) and is a charter city as well (*San Francisco Fire Fighters v. City and County of San Francisco* (1977) 68 Cal.App.3d 896, 898–899).

1. The State Act and Section 11911

In 1967, the California Legislature enacted the Documentary Stamp Tax Act, which was later given its current title of Documentary Transfer Tax Act (State Act). (Stats 1967, ch. 1332.) The impetus for the State Act was to replace the expiring federal documentary stamp tax. (*926 North Ardmore Ave., LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 329, 334 (*926 N. Ardmore*); *Thrifty Corp. v. County of Los Angeles* (1989) 210 Cal.App.3d 881, 884.) The legislation, identified as "[a]n act to add Part 6.7" of the Revenue and Taxation Code, contains four sections.

Section 1 of the State Act sets forth the provisions codified as "Part 6.7" (Rev. & Tax. Code, § 11901 et seq.), which authorize local jurisdictions to adopt ordinances taxing the transfer of real property. Specifically, Revenue and Taxation Code section 11911 (Section 11911), subdivision (a) provides:

3

"The board of supervisors of any county or city and county, by an ordinance adopted pursuant to this part, may impose, on each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrance remaining thereon at the time of sale) exceeds one hundred dollars ($100) a tax at the *rate of fifty–five cents ($0.55) for each five hundred dollars ($500)* or fractional part thereof." (Italics added.) Subdivision (b) of Section 11911 allows a city within a county that imposed a tax pursuant to subdivision (a) to impose a tax at a lower rate, with the taxpayer receiving a credit against the county tax (§ 11911, subd (c)).

Sections 2, 3 and 4 of the State Act were not codified. As relevant here, Section 2 provides: "No city or county shall directly or indirectly impose a tax on transfers of real property which is not in conformity with this part. As used in this section, *'city' does not include a chartered city and 'county' does not include a city and county*." (Italics added.) Based on Section 2, respondents contend charter cities (like San Francisco) and a "city and county" (meaning San Francisco) are not precluded from imposing a transfer tax that does not conform to Section 11911.

## 2. The Home Rule Doctrine

Article XI, section 5, subdivision (a) of the California Constitution essentially gives charter cities "home rule" power to legislate their own municipal affairs. The constitutional provision reads: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs,

4

subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

Under the home rule doctrine, "[c]harter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*City of Vista*).) Generally, local tax ordinances are deemed to address municipal affairs. (*Ex Parte Braun* (1903) 141 Cal. 204, 209 ["That the power of taxation is a power appropriate for a municipality to possess is too obvious to merit discussion."]; *California Federal Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 13 (*CalFed*) ["levying taxes to support local expenditures qualifies as a 'municipal affair' within the meaning of the home rule provision of our Constitution"].)

Nonetheless, if a local measure is in actual conflict with a state law, and the subject of the state law is a matter of statewide concern and the state statute is not overbroad, the conflicting local law must cede to the state law. (*CalFed, supra*, 54 Cal.3d at p. 17.) *Transfer* taxes have been held to reflect municipal affairs, not subject to state law. (*Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 146 [upholding Los Angeles real property transfer tax notwithstanding conflict with Govt. Code, § 53725, subd. (a), because transfer tax was purely local in its effects and thus reflected a municipal affair beyond the reach of legislative enactment]; *Fisher v. County of Alameda* (1993) 20 Cal.App.4th 120, 130 [upholding Berkeley transfer tax notwithstanding conflict with Govt. Code, § 53725, subd. (a)].)

B. <u>San Francisco's Real Property Transfer Tax Ordinance</u>

San Francisco adopted its Ordinance in December 1967 "pursuant to the authority contained in Part 6.7 (commencing with Section 11901) of Division 2 of the Revenue and Taxation Code of the State of California." (SFBTRC 1108.)  Over time, however, San Francisco has amended the Ordinance and purportedly relies on its charter city powers, rather than the State Act, as its authority for its local transfer tax.

Under the version of the Ordinance in effect on March 11, 2014—the date of the merger that generated the disputed tax liability in this case—SFBTRC 1101 and 1102 imposed a tax on the transfer of "any lands, tenements, or other realty sold," with the amount due based on "the consideration or value of the interest or property conveyed."  Unlike Section 11911, which allows a tax rate of $0.55 for each $500 or fractional part thereof in consideration or value of the interest or property conveyed, the Ordinance imposes a higher tax rate of $2.50 to $12.50 for each $500 or fractional part thereof.  (SFBTRC 1102.)  Appellants add that, unlike Section 11911, the Ordinance allows a tax base that assesses the value of liens and encumbrances, personal property, intangible assets, and interests that were not actually conveyed.  (SFBTRC 1102.)

The Ordinance mandates that a transfer tax be paid on direct sales of property—for example, the seller of a parcel of real property typically has to pay a transfer tax based on the sales price.  The Ordinance also mandates a transfer tax to be paid in two other circumstances, which are hotly debated in this appeal.  First, the Ordinance in SFBTRC 1114 defines "realty sold" under SFBTRC 1102 such that a transfer tax is triggered upon a change in the ownership of *entities* that own real property (e.g., through mergers or stock sales), where the change in ownership would trigger a property tax

6

reassessment of real property under Revenue and Taxation Code section 64. Second, under SFBTRC 1108(b), a transfer tax is triggered as to "all realty held by [a] partnership" at the time the partnership terminates.

Under the Ordinance, the transfer tax becomes due when "the deed, instrument or writing effecting a transfer subject to the tax is delivered." (SFBTRC 1115(a).) Liability for the tax rests jointly and severally on "any person who makes, signs or issues any document or instrument subject to the tax, or for whose use or benefit the same is made, signed or issued." (SFBTRC 1103.) The tax is self-reported, such that the liable party must report a taxable transaction and pay the applicable tax. (See SFBTRC 1115(a).) The tax is delinquent if unpaid 30 days after it came due, at which point penalties and interest accrue. (SFBTRC 1115(a).)

When the San Francisco Assessor-Recorder (County Recorder) has reason to believe that the transfer tax has not been fully paid, the recorder determines the amount of tax due, including penalties and interest that become part of the tax. (SFBTRC 1115(a), (c).)

If a taxpayer refuses to pay after receiving a deficiency notice, the County Recorder may initiate lien proceedings and record a lien against the property until the tax is paid. (SFBTRC 1115(d), 1115.1(a), (b).)

The Ordinance also allows San Francisco to pursue a collection action in superior court. SFBTRC 1115.4 states: "The amount of any tax, penalty or interest imposed by this ordinance shall be deemed a debt owed to the City and County of San Francisco. Any person owing the tax shall be liable in an action brought in the name of the City and County of San Francisco for the recovery of such debt."

A taxpayer has no option under the Ordinance to protest the tax without paying the amounts claimed due. Instead, the taxpayer must "pay

7

first" the amounts due and then file a lawsuit to obtain a refund. (See SFBTRC 1113; *Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 72–73 (*Batt*), overruled on other grounds in *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626.)

C. The 2014 Merger Transaction

At the heart of this case are transactions that featured a merger in May 2014 (Merger). Before the Merger, appellants directly owned two San Francisco properties. After the Merger, appellants still directly owned those two properties; what changed was the ownership of their parent company, and thus the ownership of the company that *indirectly* owned the real property.

Before the Merger, appellant CIM Urban REIT 211 Main Street (SF), L.P. (#1) held title to the real property at 211 Main Street in San Francisco.[1] Appellant CIM Urban REIT Properties II, L.P. (#2) held title to the real property at 260 Townsend Street in San Francisco. CIM Urban Partners, L.P. (#3) owned these two title-holding entities. CIM Urban REIT, LLC (#4) owned CIM Urban Partners, L.P. (#3) (except for a token $1000 capital interest and hypothetical profits that never materialized) and a subsidiary called CIM Merger Sub, LLC (#5).

Also before the Merger, CIM Urban REIT, LLC (#4) transferred to CIM Merger Sub, LLC (#5) all its interest in CIM Urban Partners, L.P. (#3) (and thus, indirectly, over 99% interest in the real estate at 211 Main Street and 260 Townsend Street). Then CIM Urban REIT, LLC (#4) formed Urban Partners II, LLC (#8) and contributed to Urban Partners II, LLC (#8) all of its interest in CIM Merger Sub, LLC (#5).

---

[1] The entities involved in these transactions were assigned numbers in the trial court. Like the parties in their briefs, we continue the numbering system.

8

Separately, PMC Commercial Trust (#7) owned 100% of a subsidiary called Southfork Merger Sub, LLC (#6). Before the Merger, PMC Commercial Trust (#7) contributed all of its assets to Southfork Merger Sub, LLC (#6).

The Merger occurred on March 11, 2014. CIM Merger Sub, LLC (#5) merged into Southfork Merger Sub, LLC (#6), with Southfork Merger Sub, LLC (#6) as the surviving entity. Accordingly, on the Merger date, Southfork Merger Sub, LLC (#6) and its owner PMC Commercial Trust (#7) received *virtually all (more than 99%) of CIM Urban Partners, L.P. (#3)*, including CIM Urban Partners, L.P.'s (#3) *indirect* ownership of the real estate at 211 Main Street and 260 Townsend Street. Thus, the Merger worked a change in the ownership of appellants' parent (CIM Urban Partners, L.P. (#3)) and a change in the indirect ownership of appellants' real property.

In exchange for receiving CIM Merger Sub, LLC's (#5) assets in the merger, Southfork Merger Sub, LLC (#6) transferred to Urban Partners II, 97.8% of stock in PMC Commercial Trust (#7).

After the Merger, through the transfer of PMC stock, CIM Urban REIT, LLC (#4) indirectly owned 97.8% of the title-holding entities (appellants).

D. Disclosure of the Merger to the State Board of Equalization

After the Merger on April 30, 2014, David Thompson—the Chief Financial Officer of appellants' parent company, CIM Urban Partners, L.P. (#3)—submitted to the State Board of Equalization (SBE) a "Statement of Change in Control and Ownership of Legal Entities," known as form BOE-100-B. (Capitalization omitted.) Thompson reported that the 2014 Merger had caused a change in control of the entity under Revenue and Taxation Code section 64, subdivision (c), as relevant to property taxes.

On Schedule A to the BOE-100-B, Thompson averred: "CIM Urban Partners, L.P. ("CIM Urban") experienced an ownership reorganization on

9

March 11, 2014. CIM Urban REIT, LLC ("CIM REIT"), was the limited partner and majority owner of CIM Urban; CIM Urban owned several parcels of real property around California through special purpose entities ("SPE's"). CIM REIT created CIM Merger Sub, LLC ("CIM Sub") a new wholly-owned LLC to which it contributed all of its capital and profits interests in CIM Urban. Concurrently with the creation of the new CIM Sub entity, PMC Commercial Trust, a publicly traded Texas REIT ("PMC"), created a new wholly-owned sub named Southfork Merger Sub, LLC ("Southfork"), a Delaware limited liability company. During the reorganization, CIM Sub was merged into Southfork, causing Southfork to obtain direct control of CIM Urban. Because the ownership of CIM Sub and Southfork were not proportional, this triggered a *direct change in control of CIM Urban and indirect changes in control of the SPE's that held record title to the real property in CIM Urban's portfolio (these were indirect changes in control under Section 64(c))*." (Italics added.)

In addition to 211 Main Street and 260 Townsend Street in San Francisco, Thompson identified 17 other investment properties throughout California that were indirectly owned by CIM Urban Partners, L.P. (#3) and experienced a change in control due to the Merger.

E. Increase in Property Tax

As a result of the change in control reported on form BOE-100-B, the property tax assessment for 260 Townsend Street increased from approximately $26.8 million to $38 million, which purportedly increased annual property taxes by more than $132,000. The property tax assessment for 211 Main Street increased from roughly $119.3 million to $229 million, purportedly increasing the annual property taxes for that property by over $1.28 million. The increase in property tax is not at issue here.

10

F. San Francisco's Demand and Lawsuit for Transfer Taxes

On March 1, 2017, the County Recorder issued to appellant CIM Urban REIT 211 Main Street (SF), L.P., "c/o CIM Group," a Notice and Demand for Immediate Payment of San Francisco County Transfer Tax, related to the 211 Main Street property. The County Recorder asserted that $9,789,750 in transfer tax, penalties and interest was due. On March 3, 2017, the County Recorder issued to appellant CIM Urban REIT Properties II L.P., "c/o CIM Group," a Notice and Demand for Immediate Payment of San Francisco County Transfer Tax related to the 260 Townsend Street property, requiring payment of transfer tax, penalties and interest in the amount of $1,624,500. According to these notices, the transfer tax arose on the Merger date, "when a new person or entity obtained control of the entity that owned the property."

In April 2017, having received no payment of the transfer taxes, San Francisco filed a complaint against appellants and others in superior court. (*City & County of San Francisco v. CIM Urban Partners, L.P.*, case no. CGC-17-558011.) San Francisco named as defendants the entities it believed were potentially liable for the unpaid amounts: CIM Urban REIT 211 Main St (SF), L.P. (#1); CIM Urban REIT Properties II, L.P. (#2); CIM Urban Partners, L.P. (#3), CIM Urban REIT, LLC (#4), CIM Merger Sub, LLC (#5), Southfork Merger Sub, LLC (#6), and CIM Commercial Trust Corporation (formerly known as PMC Commercial Trust, #7).

The CIM entities filed a demurrer to the collection complaint, which the trial court overruled. This court denied the CIM entities' ensuing writ petition. Appellants then paid in full the transfer tax, penalties and interest then due, in the amounts of $10,076,000 and $1,672,000. By stipulation of the parties, San Francisco's collection action was dismissed.

11

G.  Appellants' Refund Action

Appellants filed administrative claims for a tax refund, which San Francisco denied.  Appellants then filed this refund action in superior court.

The operative first amended complaint, filed by appellants in October 2018, includes ten causes of action.  Appellants seek a refund of the transfer tax, penalties, and interest imposed due to the Merger, as well as a judicial declaration that the Ordinance is invalid.

In April 2019, San Francisco filed a motion for judgment on the pleadings, challenging the fifth, seventh, eighth, ninth, and tenth causes of action, which had alleged that the Ordinance on its face conflicted with Section 11911, the tax violated the state constitution, and procedural requisites had not been met.  The trial court granted San Francisco's motion in June 2019.

Appellants dismissed their fourth and sixth causes of action, leaving the first, second, and third causes of action, which asserted that the Ordinance did not apply to the Merger:  essentially, there was no "realty sold" under SFBTRC 1102 because, although appellants' parent experienced a change in ownership, the parent was not the direct owner of the real property; furthermore, appellants did not experience a partnership termination under SFBTRC 1108.

The parties filed cross-motions for summary judgment as to these three causes of action in March 2020, based on stipulated facts establishing the Merger's relevant terms.  The trial court granted judgment for San Francisco in September 2020.  This appeal followed.[2]

---

[2]     In their second cause of action, appellants had asserted that the tax was precluded by SFBTRC 1109; the trial court ruled that the provision did not apply.  Appellants do not challenge that ruling here.

## II.  DISCUSSION

"In a tax refund action, the burden of proof is on the taxpayer."  (*926 N. Ardmore, supra,* 3 Cal.5th 319, 328.)  We address appellants' contentions in the order raised in their briefs.

### A.  Conflict With State Law

Appellants' amended complaint asserted that the Ordinance contravenes state law by imposing a tax rate that exceeds the maximum authorized by Section 11911 (Fifth Cause of Action) and by including in the tax base business personal property, intangible assets, and the value of property interests that were not actually conveyed (Ninth Cause of Action). The Tenth Cause of Action sought judicial declarations that the County Recorder must comply with the State Act and the Ordinance is unenforceable to the extent it requires otherwise.

The trial court granted judgment on the pleadings and dismissed these causes of action on two grounds:  in light of the uncodified section of the State Act dictating that the cities and counties to which Section 11911 applies do not include " 'a city and county,' " San Francisco was exempted from the tax rate and base requirements in Section 11911; and even if there was a conflict between the Ordinance and Section 11911, the Ordinance overrides conflicting state law under the home rule doctrine because the imposition of a local transfer tax is a municipal affair that does not implicate significant state interests.

Appellants contend the court erred in both respects.  We review de novo (*People ex rel. Harris v. PacAnchor Transportation, Inc*. (2014) 59 Cal.4th 772, 777 (*Harris*) and conclude there is no conflict between Section 11911 and the Ordinance because, properly interpreted, Section 11911 authorizes certain transfer taxes, but does not bar charter cities or a city and county

from imposing a different transfer tax.  Because no such conflict exists, appellants fail to establish that the transfer tax at issue is not authorized under the home rule doctrine.

> 1. The Ordinance Does Not Conflict With State Law

As mentioned, Section 11911—codified from Section 1 of the State Act—authorizes counties (or a "city and county") to adopt an ordinance "pursuant to this part," imposing a tax "at the rate of fifty-five cents ($0.55) for each five hundred dollars ($500)" of "realty sold" "exclusive of the value of any lien or encumbrance."  There is no dispute that the Ordinance does not conform to Section 11911 in at least one respect:  it imposes a transfer tax at a higher rate.[3]

Section 2 of the State Act, which was not codified, tells us the extent to which the Legislature intended local jurisdictions to be bound by the provisions of Section 11911.  In its first sentence, Section 2 states that "[n]o city or county shall directly or indirectly impose a tax on transfers of real property which is not in conformity with this part."  In its second sentence, however, Section 2 explains that, "[a]s used in this section, 'city' does *not include a chartered city* and 'county' *does not include a city and county*." (Stats. 1967, ch. 1332, § 2, p. 3165.  Italics added.)  Thus, unlike a general law city, a chartered city or a "city and county"—i.e. San Francisco—may

---

[3]    In *731 Market Street Owner, LLC v. City and County of San Francisco* (2020) 50 Cal.App.5th 937 (*731 Market*), San Francisco contended that the Ordinance conflicted with the State Act (in that SFBTRC 1101 calculates the consideration for, or value of, the transferred property without excluding the value of a lien or encumbrance, while Section 11911 does exclude the value of any lien or encumbrance), and the Ordinance should therefore be evaluated under San Francisco's home rule powers rather than Section 11911.  (*Id*. at pp. 950–951.)  The court concluded there was no genuine conflict that would cause resort to the home rule doctrine.  (*Id*. at p. 951.)  It therefore had no reason to consider Section 2 of the State Act, which we address here.

impose a transfer tax that is *not* in conformity with "this part" – that is, "Part 6.7," which includes Section 11911.  Put another way, Section 2 recognizes that San Francisco and other charter cities have authority under the home rule doctrine to impose transfer taxes that do not conform to Section 11911.

Appellants contend this conclusion ignores (1) the language of the State Act indicating its provisions apply to San Francisco, (2) the legislative intent to establish a statewide tax rate and base, and (3) the rule that uncodified legislative provisions cannot change the meaning of codified statutes.  We are not persuaded.

### a.  *Application of the State Act to San Francisco*

Appellants point out that Section 1 of the State Act—codified as Part 6.7 of the Revenue and Taxation Code (including Section 11911)—repeatedly says it applies to a "city and county," which is necessarily a reference to San Francisco.  While that is true in the sense that Section 1 *allows* San Francisco to impose taxes under Part 6.7, Section 2 explains that San Francisco, as a city and county, is not *limited* to enacting a tax pursuant to Part 6.7:  the first sentence of Section 2 prohibits cities and counties from imposing a transfer tax not in conformity with "this part," but then exempts San Francisco from this mandate.

Confronted with the fact that Section 2 exempts a "city and county" from the prohibition against enacting a transfer tax ordinance that is "not in conformity with *this part*," appellants next contend that "this part" does not refer to "Part 6.7" of the Revenue and Taxation Code after all.  They argue that *uncodified* Section 2 cannot be "part" of *codified* "Part 6.7," so Section 2's reference to "this part" must instead allude to the uncodified portion of the State Act (i.e., Sections 2, 3, and 4).  Under this theory, Section 2 would simply mean that a city and county is not bound by Section 3, which

15

describes the operative date for implementing the State Act.  Appellants further note that San Francisco enacted its Ordinance before the State Act's effective date.

Appellants' argument is unconvincing.  California organizes its statutes into titles, divisions, "parts," chapters, articles, and sections.  The title of the State Act legislation is:  "An act to add *Part* 6.7 (commencing with Section 11901) to Division 2 of the Revenue and Taxation Code, relating to a real property transfer tax."  (Stats. 1967, ch. 1332. Italics added.)  The State Act repeatedly uses the phrase "this part" to refer to Part 6.7.  (E.g., Rev. & Tax. Code, §§ 11911, subds. (a)–(c), 11921, 11922, 11923, 11924, 11925, subds. (a)–(d), 11931, 11932, 11933, 11934, 11935.)  If the Legislature had intended Section 2 to mean something else by "this part"—after using "this part" consistently more than 16 times in the State Act to refer to Part 6.7—the Legislature would have been keen enough to say so.  We may presume a word has the same meaning each time the Legislature uses it in the same act.  (E.g., *Barber v. California State Personnel Bd*. (2019) 35 Cal.App.5th 500, 517.)

Appellants nonetheless insist that, if the Legislature had intended Section 2 to refer to "Part 6.7," it would not have used the obvious word "part," but would have used the words "this act" instead.  Appellants point us to a line in Section 3, which states that "[t]he provisions of *this act* shall be operative on and after 12:01 a.m. on January 1, 1968," and language in Section 4 that "*this act* shall have no operative effect" if the federal government imposes a transfer tax.  (Italics added.)

Appellants' argument is untenable.  The references in Sections 3 and 4 to "this act" pertain to the *entirety* of the State Act—Sections 1, 2, 3, and

16

4—and its operative dates. By contrast, the use of the phrase "this part" in Section 2 shows that the Legislature meant something different than the entire State Act: i.e., it meant the provisions that were codified as "Part 6.7," including Section 11911.

### b. *Legislative History*

Appellants next insist the legislative history of the State Act shows that Section 2 was not intended to allow a city and county to enact a tax ordinance inconsistent with Section 1 (Section 11911). They urge that the Legislature intended to enact a uniform transfer tax rate and base across California, in light of letters asserting that the State Act was replacing (and conforming to) an expiring federal law that applied statewide, and a belief expressed by the Joint Committee of County Counsels and City Attorneys that the law would apply uniformly.

Appellants' argument is meritless. Even if the Legislature was interested in uniformity as a general matter, it plainly also expressed in Section 2 an interest in exempting charter cities and a city and county from the limitations of Section 11911. Indeed, the import of the letters appellants cite from third-parties (as opposed to statements from legislators or material provided to the legislators before their vote) pales in comparison to the Legislature's own clear and explicit statement *in the State Act itself* that charter cities and a city and county are exempt.[4]

---

[4] A letter from the County Supervisors Association of California to Governor Reagan stated, among other things, that the legislation allowed counties to share the tax revenue with cities "so that the charter cities will not embark on bizarre transfer tax schemes of their own." We question whether this letter is indicative of legislative intent, there being no legislative source mentioned for the association's view, and no indication it was presented to legislators. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 37 [letter to governor urging signing of bill is not proper legislative history]; *Heavenly Valley v. El*

*c. Uncodified Language Cannot Change Codified Language*

Appellants argue that an uncodified section of the State Act cannot be used to change the effect of the codified portion of the State Act. (*People v. Allen* (1999) 21 Cal.4th 846, 858–860.) It is well-established, however, that an uncodified section of legislation *may* be used to ascertain legislative intent. (*Ibid.* [uncodified section of a bill that enacted the legislation may have been meant as an aid in construction]; *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925 ["[a]n uncodified section is part of the statutory law," and "[a]lthough such statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute"].) Here, we do not use Section 2 to negate Section 1, but to discern the Legislature's intent as to its effect.

Section 2 explains two things about the transfer tax authorized in Section 1: first, cities and counties shall not impose a transfer tax that is not in conformity with Section 1; second, this prohibition does not pertain to a chartered city or a "city and county." (Stats. 1967, ch. 1332, § 2, p. 3165.) The upshot is that San Francisco is not bound by the restrictions in Section 1 (Section 11911). Because the restrictions do not apply to San Francisco, the Ordinance is not in conflict with Section 11911.[5]

---

*Dorado County Board of Equalization* (2000) 84 Cal.App.4th 1323, 1327 fn. 2.) Besides, the association must not have had San Francisco in mind when discussing a county sharing tax revenue with its cities, since San Francisco is a city *and* a county.

[5]     San Francisco is not bound by the restrictions set forth in Section 11911, and purports that it imposes its transfer tax pursuant to a power independent from Section 11911, namely its home rule power. (Cal. Const., art. XI, sec. 5(a); see *CalFed, supra*, 54 Cal.3d at p. 13 [levying taxes is a municipal affair under the home rule doctrine]; *Fielder, supra,* 14

18

## 2. Home Rule Doctrine

Because we find no conflict between the transfer tax under the Ordinance and the State Act, appellants' fifth, ninth and tenth causes of action are without merit. We therefore need not and do not address the trial court's alternative ground for its ruling—that the Ordinance would survive under the home rule doctrine if, in fact, it did conflict with the State Act. (*City of Vista, supra,* 54 Cal.4th at p. 555; *CalFed, supra*, 54 Cal.3d at pp. 16–17 [without an actual conflict between a state statute and a charter city measure, it is unnecessary to determine if it involves a municipal affair or a statewide concern; indeed, "[t]o the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of constitutional law, they out to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other."].)

The trial court did not err in dismissing the fifth, ninth and tenth causes of action.

## B. Failure to Notify by Recorded Instrument and to Hold a Hearing

Appellants' seventh cause of action alleged that they were entitled to a tax refund because San Francisco failed to notify them of their tax delinquencies by a recorded instrument (SFBTRC 1115(d)) or hold a hearing before the San Francisco Board of Supervisors (SFBTRC 1115.1(b)). They urge that these were jurisdictional requirements and administrative remedies that San Francisco had to exhaust before collecting the tax.

---

Cal.App.4th at p. 146 [upholding transfer tax]; *Fisher, supra* 20 Cal.App.4th at p. 130 [same]). Appellants have not specifically and substantially challenged the application of the home rule doctrine where, as here, there is no conflict between the Ordinance and Section 11911.

Moreover, appellants claim, San Francisco can no longer exhaust these administrative remedies because the time to do so has expired. (SFBTRC 1115.1(a); Code Civ. Proc., § 338, subd. (a).)

The trial court granted judgment on the pleadings on this cause of action, ruling that recordation of the delinquency notice was "to provide notice to subsequent purchasers of the property," appellants "are not within that class of persons[,] and the failure to record the notices did not prejudice them." In addition, the court observed, "there is no authority holding that [San Francisco's] failure to record the notices would eliminate [appellants'] tax liability." The court further ruled that the only provision for a hearing involves lien proceedings, which San Francisco had not pursued in this case. We review de novo. (*Harris, supra*, 59 Cal.4th at p. 777.)

1. Recorded Notice of Tax Deficiency (SFBTRC 1115)

   a. *SFBTRC 1115*

As of the time of the merger, SFBTRC 1115 was entitled "Delinquency Taxes." Under its provisions, the transfer tax came due when the document effecting the transfer was delivered, and it became delinquent if not paid within 30 days. (SFBTRC 1115(a).) The County Recorder could audit the documents effecting a transfer (SFBTRC 1115(b)) and, if it had reason to believe some amount of transfer tax was due but unpaid, determine the delinquent amount (SFBTRC 1115(c)).

The next provision in SFBTRC 1115—the one at issue here—was entitled "Delinquency Notices" and read: "Promptly after making his or her delinquent tax determination, the County Recorder *shall record a notice of delinquent tax* which shall include" the amount of delinquent tax, interest, and penalties, a description of the real property that was transferred without full payment of the tax, and a "notice that if the tax, penalties and interest

20

are not paid within 30 days, [a] proceeding will be taken at a noticed hearing before the Board of Supervisors to impose a lien for the unpaid tax, together with penalties and interest, against the real property described in the delinquency notice." (SFBTRC 1115(d), italics added.) The provision added that the County Recorder "shall also" *serve or mail copies of the notice* to the persons liable for the tax and to the owners of the subject property. (SFBTRC 1115(d).)

In their amended complaint, appellants acknowledged that the County Recorder mailed a "Notice and Demand for Immediate Payment of San Francisco County Transfer Tax" related to the 211 Townsend Street property and a similar notice regarding the 260 Townsend Street property, but alleged these mailings did not constitute a "properly prepared" notice and were not recorded or served as required by SFBTRC 1115(d). Appellants further alleged that the County Recorder prepared a draft of a SFBTRC 1115 notice but never recorded it.

### b. *Analysis*

SFBTRC 1115(d) stated that the County Recorder "shall" record and send a notice of delinquent tax, including a warning that a failure to pay within 30 days would result in a noticed proceeding before the Board to impose a lien on the property. Two questions arise: *when* did the County Recorder have this duty, and *what happens* if it failed to comply in this case?

As to the first question, the parties debate whether the duty arose every time the County Recorder made a delinquent tax determination (appellants' view), or only when the County Recorder intended to pursue a noticed proceeding before the Board to impose a lien (San Francisco's view). Each position has something going for it. Section 1115 stated the County Recorder "shall" record and serve the notice "[p]romptly after making" a

21

delinquent tax determination, suggesting the duty arose whenever a delinquent tax determination was made; in fact, this was the *only* method of notifying a taxpayer of a delinquent tax set forth in the Ordinance. On the other hand, it would be reasonable for the County Recorder to conclude there was no need to *record* a notice of delinquent tax, or to warn the taxpayer of a potential hearing for imposing a lien, if in fact the County Recorder was disinclined to impose a lien or was unable to do so (as in this case, since the transfer tax on the Merger did not become delinquent until after 211 Main Street was resold on March 29, 2017). Under that circumstance, it might be reasonable to conclude that simply mailing a notice of the amount of the delinquent tax—like the County Recorder did here—sufficed.

As it turns out, we need not decide which party has the better interpretation of SFBTRC 1115(d). Even if appellants were correct that the County Recorder had to record and serve the notice of delinquent tax every time it made a delinquent tax determination, the failure to do so here did not prejudice appellants and does not entitle them to a refund.

In the first place, appellants were adequately notified of their tax deficiency. As alleged in their amended complaint, the County Recorder mailed a "Notice and Demand for Immediate Payment of San Francisco County Transfer Tax" related to each of the properties. Although appellants alleged that the mailings did not constitute a "properly prepared notice," they did not allege why it was not properly prepared, any information required by SFBTRC 1115(d) that was omitted from the letter, or how the absence of that information limited their ability to dispute the amounts allegedly due and obtain a refund. On a motion for judgment on the pleadings, we assume the truth of well-pleaded factual allegations, but not mere conclusions. (*Harris, supra*, 59 Cal.4th at p. 777.)

22

Furthermore, from the written notices appellants received, they obtained the essential information contemplated by SFBTRC 1115(d).[6] The SFBTRC 1115(d) notice required a statement of the amount of delinquent tax, interest, and penalties; a description of the real property that was transferred; and a "notice that if the tax, penalties and interest are not paid within 30 days, [a] proceeding will be taken at a noticed hearing before the Board of Supervisors to impose a lien for the unpaid tax, together with penalties and interest, against the real property described in the delinquency notice." (SFBTRC 1115(d).) The notices mailed by the County Recorder communicated the amounts due, identified the property, and, in boldface print, warned that if payment was not received by a specified date, "the Assessor-Recorder will pursue all available legal remedies to collect the unpaid tax, *up to and including initiating lien proceedings* or other legal actions." (Italics added.) Although it did not specifically warn that there would be a noticed hearing before the Board, appellants were not entitled to such a hearing (see *post*). In short, appellants were informed of what they needed to know to pay the tax, and even a notice fully compliant with SFBTRC 1115(d) would not have given them any greater opportunity to challenge the tax; indeed, no challenge could be mounted until the tax was paid.

In addition, appellants were not prejudiced by the fact that the notice of tax deficiency was not *recorded*. The purpose for recording a deficiency notice is to alert third parties to San Francisco's claim of unpaid transfer tax in case

---

[6] These letters were the subject of San Francisco's request for judicial notice in connection with their motion for judgment on the pleadings. It appears from the order that the court took judicial notice of these documents. (See *Harris, supra*, 59 Cal.4th at p. 777 [courts may consider judicially noticeable matters in deciding the motion].)

23

the delinquent taxpayer attempts to sell the property. Appellants do not suggest any other purpose. Because appellants are not the ones who would have benefitted from the recordation of the notice, the absence of recordation cannot entitle them to a refund. (See *Ryan v. Byram* (1935) 4 Cal.2d 596, 603 (*Ryan*) [only those provisions enacted for the benefit of the taxpayer are mandatory].)

Lastly, contrary to appellants' argument, the SFBTRC 1115(d) requirement to record and serve the notice was not jurisdictional, in the sense of being an administrative duty that San Francisco had to fulfill to impose and collect the tax. The transfer tax came due without San Francisco having to do anything: it was the taxpayer's responsibility to calculate and pay the tax without waiting for an assessment. (SFBTRC 1102, 1115(a).) Appellants cite no authority holding that a failure to warn of a hearing to which the taxpayer is not entitled, or to record a deficiency notice when the taxpayer was given actual notice of the basis and amount of their liability, renders the tax invalid and compels a refund.

In this regard, appellants' reliance on *City of Oakland, Cal. v. Hotels.com LP* (9th Cir. 2009) 572 F.3d 958 (*City of Oakland*) is decidedly misplaced. There, a city filed suit to collect taxes against defendants without first complying with its duties under an ordinance to obtain facts and information on which to base the estimate of tax due, assess the tax, give notice of the amount to be assessed, offer an administrative appeal, and provide a hearing before any assessment "shall become final." (*Id.* at pp. 960–961.) Under the rubric of a failure to "exhaust administrative remedies," the court ruled that the city could not yet sue to collect the taxes, noting that the exhaustion of remedies is a jurisdictional requirement. (*Id.* at p. 962.)

24

*City of Oakland* is inapposite. In the first place, the County Recorder in this case did not breach administrative duties akin to what occurred in *City of Oakland*. There, the city was required to gather information and estimate the tax due; here, by contrast, the taxpayer was required to ascertain (and pay) the tax. (*Id*. at p. 961) There, the city failed to meet its obligation to give notice of the amount unpaid; here, San Francisco *did* determine the amount unpaid and mailed notice of this deficiency. And despite the provision in SFBTRC 1115 for the County Recorder to record the notice, recordation was not for the taxpayer's benefit and pertained to a potential remedy the County Recorder never pursued.

Moreover, *City of Oakland* held that the city's failure to exhaust its administrative remedies was jurisdictional only in that the city could not yet file a lawsuit to recover the tax. Here, it is not San Francisco that filed the lawsuit underlying this appeal, but appellants. Nowhere does *City of Oakland* suggest that taxes must be refunded to taxpayers after they received notice of (and paid) the tax, merely because the notice they received before paying it was not recorded.

Appellants also argue that laws requiring notice and a hearing are for the taxpayer's benefit and are thus mandatory. (Citing *Ryan, supra*, 4 Cal.2d at pp. 603, 607.) *Ryan*, however, was not referring to every notice or hearing provision that might appear in an ordinance, but to specific provisions in Political Code section 3714 that enabled a taxpayer to learn of a budget and a hearing at which the budget could be contested. (*Ryan, supra,* 4 Cal.2d at

25

p. 607.) Here, appellants had notice of the delinquent tax and, after paying it, the opportunity to contest it by a refund action. The absence of a recorded notice under SFBTRC 1115 was neither prejudicial nor jurisdictional.[7]

## 2. Board of Supervisors Hearing (SFBTRC 1115.1)

Appellants next argue that a hearing before the San Francisco Board of Supervisors (Board) was a prerequisite for San Francisco to collect a disputed transfer tax. Not so.

The hearing provision appeared in SFBTRC 1115.1, which describes the procedure for imposing a lien against the real property that was transferred without full payment of tax. Under SFBTRC 1115.1(a), then entitled "Initiating Lien Proceedings," if the full delinquent amount is not paid within 30 days of mailing the delinquency notice, the County Recorder, within one year of when the tax became delinquent, "shall report the delinquency to the [Board] and request the Board to initiate proceedings to impose a lien for the total unpaid balance against the [subject] real property." (SFBTRC 1115.1(a).) Upon receipt of the County Recorder's report, "the Board shall fix a time and place for hearing the report and any protests or

---

[7] Appellants' other citations also miss the mark. Some involved a total absence of notice. (E.g., *Gaumer v. County of Tehama* (1967) 247 Cal.App.2d 548, 549–551 [failure to give statutory notice of an increased assessment meant that the portion of the tax based on the increased assessment was void]; *Tamco Development Co. v. County of Del Norte* (1968) 260 Cal.App.2d 929 [similar].) Others addressed the need for a *plaintiff* to exhaust remedies before suing a government agency. (*City and County of San Francisco v. County of San Mateo* (1950) 36 Cal.2d 196, 201; *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 291–293.) In *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 729–730, the court found that the plaintiffs were entitled to a refund from the SBE, and the SBE could not obtain an offset against that refund based on a ground for taxation that the SBE had not raised in the administrative proceedings. That scenario did not occur here.

26

objections thereto and shall cause notice of the hearing to be mailed . . . to each person liable for the tax and to the [owner(s)] of the [subject] real property." (SFBTRC 1115.1(a).)

Subdivision (b) of SFBTRC 1115.1 then describes the lien hearing: "At the time so fixed, the Board shall meet to hear the report and any protests or objections thereto." If the Board is satisfied with the correctness of the report, the report shall be confirmed, and "the unpaid balance reported therein, including tax, penalties and interest, shall constitute a special assessment against the real property that was transferred" and the lien continues until the assessment and all interest and penalties are paid. (SFBTRC 1115.1(b), (c).)

By the plain language of the Ordinance, therefore, the hearing occurs only when San Francisco initiates lien proceedings, and only for the purpose of imposing a lien. And that makes sense: holding a hearing in every instance of delinquent transfer taxes, as a prerequisite for collecting the tax, would burden the Board and be contrary to the established principle that taxpayers must "pay first" and litigate later.[8] On the other hand, holding a hearing before the government imposes a lien and impairs the taxpayer's title would be consistent with due process. (See *E. Gottschalk & Co. v. County of Merced* (1987) 196 Cal.App.3d 1378, 1382–1383 [statutory provisions must be given practical and commonsense construction, avoiding unreasonableness].) Because the County Recorder did not initiate lien proceedings in this matter, appellants were not entitled to a hearing under SFBTRC 1115.1.

The trial court did not err in dismissing the seventh cause of action.

---

[8] See SFBTRC 1113; *Batt, supra,* 155 Cal.App.4th at p. 72 [due process does not guarantee the right to judicial review of tax liability before judgment; all that is required is a procedure to contest the legality at some point, such as a refund action].

## C. SFBTRC 1102:  "Realty Sold" and Indirect Change of Ownership

We now turn to appellants' assertions that, even if the Ordinance is valid and San Francisco did not fail to exhaust its administrative remedies, the Merger did not trigger a transfer tax under the Ordinance.  We begin with appellants' arguments under SFBTRC 1102.

As stated in SFBTRC 1102, a transfer tax is "imposed on each deed, instrument or writing by which any lands, tenements, or other *realty sold* within the City and County of San Francisco shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or her or their direction." (Italics added.)

In their third cause of action, appellants alleged the Merger involved no "realty sold" within the meaning of SFBTRC 1102.  Neither appellant sold any of its realty.  Although the Ordinance defines "realty sold" in SFBTRC 1114 to also include realty owned by entities experiencing a change of ownership, appellants contend that applies only to property *directly* owned by those entities.  Thus, while appellants' parent, CIM Urban Partners, L.P. (#3), experienced a change in ownership due to the Merger, it was not the direct owner of the property (appellants were); therefore, appellants claim, no transfer tax liability arose.  The trial court rejected appellants' argument based on the parties' stipulated facts.  We review de novo.[9]  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)

---

[9]     Appellants complain that the trial court rejected their argument that San Francisco assessed the 2014 Merger using the 2016 version of the Ordinance.  They claim the court erred because San Francisco had the burden on summary judgment and San Francisco's collection complaint quoted the 2016 version.  The question, however, is not what San Francisco relied on, but whether the transfer tax was proper under the version of the Ordinance in effect at the time of the Merger.

1. <u>"Realty Sold"</u>

As of the date of the Merger, "realty sold" was defined in SFBTRC 1114 as follows: "[F]or the purposes of this ordinance, the determination of what constitutes 'realty' shall be determined by the definition or scope of that term under state law. Notwithstanding the preceding sentence, *'realty sold' includes any acquisition or transfer of ownership interests in a legal entity that would be a change of ownership of the entity's real property under California Revenue & Taxation Code § 64.*" (Italics added.)

Revenue and Taxation Code section 64 (Section 64) in turn provides in subdivision (c)(1) that, for purposes of property taxes, when an entity obtains control of a second entity through a transfer of ownership interests, there is generally deemed a change in ownership of the real property of the second entity, triggering a reassessment of the property. (See also Rev. & Tax. Code, § 60 [change in ownership is "a transfer of a present interest in real property, including the beneficial use thereof . . . ."].) The parties to this appeal do not dispute that Section 64, subdivision (c)(1) can apply to indirectly-held real estate: that is, a change in controlling ownership of an entity can trigger a property tax reassessment as to real property directly owned by that entity and real property *indirectly* owned by that entity (e.g., the property of a subsidiary under the entity's control). (See, e.g., *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 91 (*Title Ins.*)) Thus, to the extent "realty sold" includes a transfer of ownership interests that would constitute a change of ownership under Section 64, the transfer tax can be triggered as to property directly *or indirectly* owned by the entity that experienced the change of ownership.

Instructive in this regard is *926 N. Ardmore, supra,* 3 Cal.5th 319, which interpreted "realty sold" with reference to the *State* Act. There, the

29

Los Angeles County Recorder had imposed a tax based on the transfer of interests in a partnership that indirectly owned real property in the county. (*Id.* at pp. 325–326.) Noting that "[t]he county's tax provision employ[ed] substantively identical language [to Section 11911], with slightly different punctuation," the court looked to Section 11911 to determine whether the county was authorized to impose the tax. (*Id.* at p. 329.)

Section 11911 (like SFBTRC 1102) permits the county to levy a tax "on each deed, instrument, or writing by which any lands, tenements or other *realty sold* within the county shall be granted." (§ 11911, subd. (a).) Although the State Act contains no definition of "realty sold," the court recognized that "the transfer of an interest in a legal entity that owns real property can potentially trigger imposition of the tax." (*926 N. Ardmore, supra,* 3 Cal.5th at p. 332.) The court observed: "the critical factor in determining whether the documentary transfer tax may be imposed is whether there was a sale that resulted in a transfer of beneficial ownership of real property." (*Id.* at p. 337.) The court turned to change in ownership provisions in Section 64, concluding that "the change in ownership rules are designed to identify precisely the types of indirect real property transfers that the Transfer Tax Act is designed to tax." (*Id.* at p. 337.) The court held: "Section 11911 permits the imposition of a documentary transfer tax whenever a transfer of an interest in a legal entity results in a change in ownership of real property within the meaning of section 64, subdivision (c) or (d), so long as there is a written instrument reflecting a sale of the property for consideration." (*Id.* at p. 338.) Because there were written instruments reflecting the transfer of beneficial ownership of the real property and there was consideration for the sale, the transfer tax was correctly imposed. (*Ibid.*)

Our Supreme Court thus held that "realty sold" in Section 11911 includes transfers that effect a change in ownership of an entity within the meaning of Section 64, subdivisions (c) and (d), which can reach property owned (directly or indirectly) by those entities. Simply put, what triggers reassessment under Section 64, subdivision (c) or (d), triggers a transfer tax under Section 11911. (*926 N. Ardmore, supra*, 3 Cal.5th at p. 338.)[10]

Here, CIM Urban Partners, L.P. (#3) experienced a change in ownership, and CIM Urban Partners, L.P. (#3) was the parent and 100 percent owner of the title-holding entities, appellants CIM Urban REIT 211 Main St (SF), L.P. (#1) and CIM Urban REIT Properties II, L.P. (#2). If "realty sold" in SFBTRC 1102 has the same meaning as "realty sold" in Section 11911, the Merger was a taxable transaction under the Ordinance.

But therein lies the rub. Is, in fact, "realty sold" in SFBTRC 1102 the same as "realty sold" in Section 11911?[11] San Francisco says yes, since SFBTRC 1114 defines "realty sold" in terms of Section 64. Appellants say no, claiming there is language in SFBTRC 1114 that limits "realty sold" to property *directly* owned by the entity whose ownership interests were transferred, thus distinguishing Section 11911 and *926 N. Ardmore*.

---

[10]     More precisely, the transfer tax can apply to real property that the entity indirectly owns for which a reassessment would be triggered under Section 64, subdivision (c) or (d). There is no dispute in this case that a reassessment was triggered as to appellants' properties under Section 64, subdivision (c)(1): the letter from appellants' parent company to SBE states as much. (See *Title Ins., supra,* 48 Cal.3d at pp. 91–92 [by obtaining control of parent company, acquirer obtained indirect control of subsidiary and effected a change in the ownership of the subsidiary's real property].)

[11]     In *731 Market Street*, we evaluated the meaning of "realty sold" in SFBTRC 1102 by looking to Section 11911. (*731 Market Street, supra*, 50 Cal.App.5th at pp. 943–944.) The version of SFBTRC 1114 at issue there, however, did not include the language that we examine here.

31

Specifically, appellants note, SFBTRC 1114 does not say "realty sold" includes a change of ownership in an entity that would "be a change of ownership under California Revenue & Taxation Code § 64," but that it includes a change of ownership in an entity that would "be a change of ownership *of the entity's real property* under California Revenue & Taxation Code § 64." (Italics added.) Appellants believe those words— "of *the* entity's real property" (italics added)—were used to signal that the entity whose ownership is being changed must be the entity whose property is undergoing the ownership change – in other words, SFBTRC 1114 limits "realty sold," and thus the reach of SFBTRC 1102, to real property *directly* owned by the entity whose ownership interests were transferred. To evaluate appellants' argument, we turn to fundamental rules of statutory construction.

2. Analysis of SFBTRC 1114

In construing the Ordinance, we apply the same rules of interpretation applicable to statutes. (*AudioVisual Services Group, Inc. v. Superior Court* (2015) 233 Cal.App.4th 481, 489.) We look first to the language of the provision, "construing the words in light of the Ordinance as a whole and its purpose." (*Id*. at p. 489; see *Title Ins., supra*, 48 Cal.3d at p. 91.) We do not extend tax provisions "beyond the clear import of the language used." (*731 Market Street, supra*, 50 Cal.App.5th at p. 944.) But we do look to give meaning to every word, phrase, and provision. (*Meyers v. The Retirement Fund of Federated City Employees* (2014) 223 Cal.App.4th 1201, 1206; *Nativi v. Deutsche Bank National Trust Company* (2014) 223 Cal.App.4th 261, 283–284.)

The plain meaning of the words in SFBTRC 1114—that "realty sold" means "any acquisition or transfer of ownership interest in a legal entity that would be a change of ownership of the entity's real property under [Section

32

64]"—is that SFBTRC 1102 is intended to be triggered whenever there is a transfer that triggers reassessment under Section 64.  While appellants fixate on the words, "of the entity's real property," the operative phrase is actually "a change of ownership of the entity's real property *under [Section 64]*."  (SFBTRC 1114, italics added.)  Under Section 64, the real property to be reassessed is both the entity's real property held directly and the entity's real property held indirectly, such as property owned by a controlled subsidiary.  (*Title Ins., supra*, 48 Cal.3d at pp. 91–92.)  The words in SFBTRC 1114 therefore manifest an intent to impose transfer tax as to any property that would be reassessed pursuant to Section 64, whether the entity owns it directly or indirectly.

This construction is compelled not only by the words of SFBTRC 1114, but also by the purpose of the Ordinance and the function of SFBTRC 1102 and SFBTRC 1114.  The Ordinance's goal is to collect transfer taxes, and the obvious aim of referring to Section 64 *at all* in SFBTRC 1114 was to avoid the evasion of transfer taxes by entities transferring ownership interests in lieu of transferring real property.  There is no discernable reason to embrace only part of the reach of Section 64 (guarding against the evasion of transfer tax as to directly-held property), while leaving the gate wide open as to indirectly-held property.  Such an interpretation would "elevate form over substance, and conflict with the purposes of the" Ordinance.  (*926 N. Ardmore, supra*, 3 Cal.5th at p. 338.)

In light of the plain language of SFBTRC 1114, the function of that provision, and the purpose of the Ordinance overall, the definition of "realty sold" is clear and we need not resort to other sources to resolve ambiguity. (E.g., *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094,

33

1103.) We nonetheless consider the legislative history presented to us and find it confirms our conclusion.[12]

### a. *Relevant History of SFBTRC 1114 (Proposition N)*

The portion of SFBTRC 1114 at issue here—that " 'realty sold' includes any acquisition or transfer of ownership interests in a legal entity that would be a change of ownership of the entity's real property under [Section 64]"— was added to SFBTRC 1114 in 2008, before the Merger, by Proposition N.

Proposition N asked voters whether the City should increase its transfer tax on sales of real estate worth more than $5 million and reduce the tax on sales of residences with certain solar energy or seismic improvements. The Controller's Statement in the ballot materials apprised voters of the additional aspect of the proposition relevant here: "Finally, the ordinance clarifies that *acquisitions or transfers of ownership interests in a legal entity* are subject to the transfer tax." (Italics added.) The Controller explained that, "[b]ecause current law does not require owners to record a deed at the time of such transfers, no data are available to estimate the value of these transactions."

In this regard, the Proponent's Argument in Favor of Proposition N explained to voters that the proposition was intended to close "a serious loophole in our real estate transfer tax [that] is allowing multinational corporations to evade paying their fair share." The proponents further advised: "The multinational real estate interests use shell companies and tricky accounting to game our tax system, costing the City tens of millions of

---

[12] In February 2021, appellants sought judicial notice of the records of the Board and other 2016 materials relating to San Francisco's use of revenues generated by its transfer tax. In May 2021, respondents sought judicial notice of excerpts from the Voter Pamphlet for San Francisco's Proposition N. We deferred ruling on these requests until our consideration of the merits. We now grant the requests.

dollars in lost revenue.  Yes on N closes the loophole that allows them to shelter their transactions—creating a more equitable tax structure and saving essential services threatened by our massive deficit."  In the Rebuttal to Opponent's Argument, the proponents reiterated:  "Proposition N closes tax loopholes that are being exploited by multi-national real estate corporations at the cost of tens of millions of dollars that should rightfully be funding vital services for San Franciscans."

Neither these depictions of Proposition N, nor the paid arguments in favor of the proposition, made any distinction between direct and indirect ownership of the realty.  The paid arguments stated:  "Proposition N closes a real estate tax loophole abused by some of the biggest corporations in the world to avoid paying tens of millions of dollars to our city over the past five years."  "For years, some have avoided paying the City tens of millions of dollars in taxes by transferring ownership of corporate entities rather than actually transferring titles to property.  Prop N ends this practice by clarifying that *transfers of corporate entities owning property are subject to our local tax*."  (Italics added.)

While appellants tell us that "[t]he owner of the shares of stock in a company is not the owner of the corporation's property" (*Rhode Island Hospital Trust Co. v. Doughton* (1926) 270 U.S. 69, 81), and a corporate parent does not "own" the assets of its subsidiary (*Dole Food Co. v. Patrickson* (2003) 538 U.S. 468, 474–475), it is not these finer points of law that were presented to the voters or ostensibly in the minds of the drafters.  To the contrary, it was the avowed intent to "close[] a real estate tax loophole" created by these legal niceties, which had allowed corporate entities to shield themselves from transfer taxes by "transferring ownership of corporate entities rather than actually transferring titles to property."  This sentiment

35

is compatible with a transfer tax that would reach properties indirectly owned by those entities, as opposed to one that would not.

### b. Proposition W

In 2016—after the Merger—Proposition W amended the Ordinance by, among other things, changing the rate of the transfer tax and, as relevant here, clarifying the language in SFBTRC 1114.

As to SFBTRC 1114, Proposition W amended the definition of "realty sold" as follows (with unchanged text in plain font, deletions in strikethrough, and additions bolded):  " 'realty sold' includes any acquisition or transfer of ownership interests in a legal entity that would be a change of ownership of ~~the entity's~~ real property under California Revenue ~~&~~ **and** Taxation Code ~~§~~ **Section** 64.  **In such cases, there shall be deemed to have been an instrument executed whereby there was conveyed for fair market value, all real property that experienced a change of ownership under California Revenue and Taxation Code Section 64**."

Appellants contend Proposition W was meant to *extend* transfer tax liability to transfers of ownership in an entity indirectly holding realty by deleting the phrase "the entity's" from SFBTRC 1114's definition of "realty sold."  Ergo, they argue, SFBTRC 1114 at the time of the Merger did not reach indirectly-owned property.

In our view, the opposite is true.  Proposition W confirms that SFBTRC 1114, at the time of the Merger, *did* apply to indirectly-owned property as well as directly-owned property, and the idea was to make sure there was no foothold for arguments such as the ones appellants make here.

In the first place, the ballot materials touted Proposition W not for changing the reach of the transfer tax, but for increasing the *rate* of the transfer tax.  The voters pamphlet explained:  "Proposition W would increase

36

the transfer tax rate for real estate with a sale price of more than $5 million." According to the Proponent's Argument in support of the ballot measure: "Prop W is very simple:  we're asking those who are doing very well to pay *just a little more* when they sell luxury properties they own to help improve vital city services and create more opportunity." (Italics added.)  The debate in the ballot pamphlet pertained exclusively to the transfer tax rate increase.

Furthermore, neither the official description of Proposition W, the Controller's Statement, the Proponent's Statement, the Opponent's Statement, nor any of the arguments for or against the measure stated that Proposition W would expand the scope of corporate transactions subject to transfer tax, or that the transfer tax would be changed to apply to indirectly-owned property rather than just directly-owned property. Tellingly, the Controller's Statement did not mention any increase in revenue that would have resulted from such an expansion of the transfer tax.

Moreover, the ballot materials that did set forth the changes in SFBTRC 1114 stated that the purpose of the amendment was "to *clarify* the application of the Real Property Transfer Tax to transfers of ownership interests in legal entities," not to break new ground as to the reach of San Francisco's tax laws.  (Italics added and bolding omitted.)  The plain inference is that the intent to reach indirectly-owned property, embraced clearly in the amendment, was what Proposition N was meant to do all along; the redaction of "the entity's" from "the entity's real property" merely confirmed that SFBTRC 1114, even at the time of the Merger, applied to indirectly-owned property of entities whose ownership had changed.[13]

---

[13]     Because Proposition W's ballot materials explicitly stated that it was clarifying existing law rather than changing it, the cases appellants cite are inapposite.  (*City of Irvine v. Southern California Assn. of Governments* (2009) 175 Cal.App.4th 506, 522 [presumption that the legislature was intending to

37

In light of the plain language of SFBTRC 1114, the purpose of that provision and the Ordinance overall, and the ballot material submitted to the voters, the Ordinance applied to realty indirectly owned by entities experiencing a change in ownership. Accordingly, based on the parties' stipulated facts and as a matter of law, SFBTRC 1102 applied to the Merger and appellants' property. The court did not err in dismissing appellants' third cause of action.

D. SFBTRC 1108: Termination of Partnership

Under SFBTRC 1108(b) at the time of the Merger, the transfer tax was triggered as to realty "held by" a partnership upon the partnership's termination. SFBTRC 1108(b) provided: "If there is a *termination of any partnership* or other entity treated as a partnership for federal income tax purposes within the meaning of Section 708 of the Internal Revenue Code of 1986, as amended, for purposes of this Article, such partnership or other entity shall be treated as having executed an instrument whereby there was conveyed, for fair market value, *all realty held by such partnership* or other entity at the time of such termination." (Italics added.)

In their first cause of action, appellants alleged they were not liable under SFBTRC 1108 because, although they are (limited) partnerships, they did not undergo a partnership termination. The trial court found the Ordinance applied nonetheless, because the Merger terminated appellants' parent—partnership CIM Urban Partners, L.P. (#3)—and appellants' property was "realty held" (indirectly) by CIM Urban Partners, L.P. (#3).

---

change a statute by creating a new right, or withdrawing an existing one, where it deletes a provision from a statute]; *Hoschler v. Sacramento City Unified School Dist.* (2007) 149 Cal.App.4th 258, 269 [omission of a provision indicates a change of legislative intention].)

Appellants contend the court erred.  Echoing their arguments that SFBTRC 1102 applies only to property directly owned by an entity experiencing an ownership change, appellants assert that SFBTRC 1108(b) applies only to realty directly held by the partnership experiencing a termination.  Thus, they argue, although CIM Urban Partners, L.P. (#3) was terminated and it owned the interests in appellants, it did not own appellants' property (Corp. Code, § 16203), so appellants' property was not "realty held" by CIM Urban Partners, L.P. (#3).

We disagree.  Given the purpose of the Ordinance as described *ante*, "realty held" in SFBTRC 1108(b) should be construed to apply to the indirect property holdings of terminated partnerships.  Limiting the transfer tax to direct holdings of terminated partnerships would permit entities to avoid the transfer tax by holding real property through more complicated corporate structures.

Appellants observe that SFBTRC 1108(b) refers to "realty held by a partnership" rather than "realty held *directly or indirectly* by such partnership," claiming this is significant because the phrase "directly or indirectly" does appear in reference to direct and indirect ownership interests in subdivision *(d)* of SFBTRC 1108.  (Citing, e.g., *Craven v. Crout* (1985) 163 Cal.App.3d 779, 783 ["omission of [a] word or phrase from a similar statute on the same subject generally shows a different legislative intent"].)  But SFBTRC 1108(d) pertained to a different subject.  It did not use the phrase "directly or indirectly" in describing the way realty is held by the partnership, but in stating an exclusion to transfer tax liability when the proportional ownership interest of the transferor and transferee "directly or indirectly, remains exactly the same before and after the transfer."  Because SFBTRC 1108(d) addresses a different subject, its wording sheds no light on the

39

wording of SFBTRC 1108(b). The trial court did not err as to appellants' first cause of action.

E. Proper Taxpayer

SFBTRC 1103 provides: "Any tax imposed pursuant to [SFBTRC 1102] shall be paid by any person who makes, signs or issues any document or instrument subject to the tax, or for whose use or benefit the same is made, signed or issued."

In the summary judgment proceedings, appellants argued that San Francisco had taxed the wrong entities under SFBTRC 1103, because appellants were not party to or beneficiaries of the Merger agreement. The trial court rejected the argument, finding that the tax was imposed on the merger agreement rather than on appellants, and San Francisco asserted that it was CIM Group, not San Francisco, that had decided who would write the check for the tax. Appellants contend this was error.

1. Appellants are Precluded from Relief Under SFBTRC 1103

Back in March 2017, San Francisco had addressed its delinquency notices to each appellant "c/o CIM Group," and in April 2017 named all the entities as defendants in its collection action. Although appellants and the other defendants demurred to the collection complaint, the record does not show they cited SFBTRC 1103 as a reason they could not be liable. After the demurrer was overruled, appellants were the ones who paid the tax, which led to the stipulated dismissal of San Francisco's collection action. Because appellants induced the dismissal of San Francisco's action without disclosing they would later seek a refund due to SFBTRC 1103, we question how equitable it would be for appellants to obtain a refund on that ground. [14]

---

[14] San Francisco emphasizes that it addressed the deficiency notices to "CIM Group" and it was CIM Group that decided which of its entities would pay the tax; therefore, appellants should not be able to get out of it now.

In addition, appellants failed to exhaust their administrative remedies in regard to SFBTRC 1103. In a tax refund claim, the taxpayer must state "the grounds upon which the claim is founded, with specificity sufficient to enable [the Tax Collector and] other responsible City officials to understand and evaluate the claim." (SFBTRC 6.15-1(b)(3); see Govt. Code, § 910.) Appellants do not point to any part of their refund claims—which amassed well over 300 pages—in which they contended they were entitled to a refund due to SFBTRC 1103. Although appellants asserted they were "[n]ot the [a]ppropriate [a]ssessee," that was in the context of claiming they were not an assessee under SFBTRC 1114 because "[n]o interests in [appellants] changed hands;" it is an entirely different thing to claim they were not the appropriate payor under SFBTRC 1103 because the merger agreement was not for their use or benefit. As such, appellants failed to put San Francisco on notice of any purported violation of SFBTRC 1103. And because the SFBTRC 1103 argument was not made expressly, and was not intertwined with or implicit in its arguments regarding other provisions of the SFBTRC, appellants are precluded from asserting the claim in this refund action. (*Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1264–1265 [taxpayer claiming

Appellants counter there was no evidence to support the conclusion that CIM Group decided appellants would pay, urging that " 'CIM Group' is not a legal entity, but a term coined by San Francisco in demanding payment of the transfer taxes." Appellants misstate the evidence in regard to the genesis of "CIM Group." In his statement to the SBE, the Chief Financial Officer of CIM Urban Partners, L.P. had identified the relevant party with an address "c/o CIM Group" and named the contact person for "CIM Group" with an email address having a domain name of "cimgroup.com." At any rate, whether or not appellants paid due to a CIM Group decision (or simply because their names were on the deficiency notices), the point is that they did so without claiming they were outside the scope of SFBTRC 1103.

nonownership of assessed property was required to exhaust administrative remedies in assessment appeals process as prerequisite to refund action].)

Moreover, appellants did not assert a cause of action based on SFBTRC 1103 in their refund action. In fact, they did not mention SFBTRC 1103 at all in their pleadings, including in the paragraphs describing their refund claims. Because the pleadings " 'set the boundaries of the issues to be resolved at summary judgment' " and dictate what facts are material (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250), the SFBTRC 1103 issue was not properly before the trial court.

For these reasons, appellants cannot compel a tax refund based on SFBTRC 1103. To the extent their arguments in the summary judgment proceedings might nonetheless be germane to their liability under SFBTRC 1102, however, we proceed to the merits.

2. <u>Merits</u>

Appellants invoked SFBTRC 1103 in the context of the summary judgment cross-motions on their cause of action seeking a refund due to the inapplicability of SFBTRC 1102. To preclude summary adjudication in favor of San Francisco, appellants had to present evidence demonstrating a triable issue of material fact (or show that San Francisco was not entitled to judgment under the law); to obtain summary adjudication of their own, appellants had to demonstrate there was no issue of material fact and they were entitled to judgment as a matter of law. (Code Civ. Proc., § 437c.) They did neither.

SFBTRC 1103 makes liable for the transfer tax "any person . . . for whose use or benefit the [merger agreement] is made, signed or issued." Appellants offered no evidence as to whether they were to "use" and "benefit" in the merger agreement, except a provision in the agreement that read:

42

"Nothing in this Agreement, express or implied, is intended, or shall be deemed, to confer on a person other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement."

Appellants failed to offer any independent evidence that they were not the parties' "respective successors and permitted assigns," and therefore failed to demonstrate that the provision applied to them. Moreover, the provision does not address the query posed by SFBTRC 1103, because SFBTRC 1103 does not turn on whether the triggering document "confer[s] . . . rights, remedies, obligations or liabilities" on a non-signatory. In keeping with the purposes of the Ordinance, SFBTRC 1103 more broadly targets any person or entity for whose *use* or *benefit* the merger agreement was made. By pointing narrowly to the single clause in the merger agreement, appellants failed to present evidence as to a *material* fact and failed to present any argument demonstrating that, as a matter of law, they were not liable due to SFBTRC 1103.

## III. DISPOSITION

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.

*CIM Urban Reit 211 Main Street (SF) v. City & County of San Francisco*/A161244

44

A161244 / CIM Urban Reit 211 Main Street v. City and County of San Francisco

Trial Court:  San Francisco County Superior Court

Trial Judge:  Hon. Ethan P. Schulman

Counsel:  Greenberg Traurig; Bradley Randolph Marsh, Ruben Sislyan, and Colin W. Fraser for Plaintiffs and Appellants.

Howard Jarvis Taxpayers Foundation; Jonathan M. Coupal, Timothy A. Bittle, and Laura E. Dougherty as Amicus Curiae on behalf of Plaintiffs and Appellants.

Scott Michael Reiber, Chief Tax Attorney; Dennis J. Herrera, City Attorney; James Moxon Emery and Carole F. Ruwart, Deputy City Attorneys; for Defendants and Respondents.